204 So.2d 881 (1967)
The STATE of Florida, Appellant,
v.
The JACKSONVILLE PORT AUTHORITY, Appellee.
No. 36379.
Supreme Court of Florida.
July 19, 1967.
Opinion Revised and Rehearing Denied October 4, 1967.
William A. Hallowes, 3rd, Jacksonville, and Frank M. Scruby, Orange Park, for appellant.
F. Bradley Kennelly, Francis P. Conroy and Chester Bedell, Jacksonville, for appellee.
DREW, Justice.
This is an appeal of the State from a decree of the Circuit Court of Duval County, Florida, validating $111,000,000.00 Special Purpose Bonds proposed to be issued by the Jacksonville Port Authority, a public agency, for the construction and acquisition of Special Purpose Facilities to be located on Blount Island, Duval County, which island is now owned by the Authority. Such facilities are to consist of shipyard and repair facilities, including buildings, improvements, fixtures, docks, dry docks, wharfs, bulkheads, machinery and equipment.
The Authority has entered a lease and a "Supplemental Agreement" with Lockheed Aircraft Corporation, a private corporate tenant covering 500 acres of land on Blount Island, and the Special Purpose Facilities to be placed thereon. The first term of the *882 lease extends 25 years with option in Lockheed to renew the lease for ten consecutive additional terms of five years each. Rentals to be paid thereunder are estimated to be sufficient to pay the principal and interest of said bonds and all sinking fund or other payments required thereunder. Such rentals are the only funds pledged to retire the bonds. The ad valorem tax power of the County is expressly precluded in the bond resolution from ever being resorted to in servicing the bonds.
Lockheed agrees to use the leased premises and the facilities to be placed thereon
"* * * for the operation of a shipyard and ship repair facility * * * [and to] provide repair, overhaul, modification and services to the general public when consistent with its commitments to the United States Government."
These commitments to the Government refer to contracts Lockheed expects to enter with the Navy for the construction of Fast Deployment Logistic Cargo Ships.
In validating the bonds the Chancellor found, inter alia,
"FOURTH: That said Special Purpose Facilities so leased will be used by Tenant to offer ship construction, repair and maintenance services to the general public and the various agencies of the State and Federal Government, including the United States Navy under a program known as the Fast Deployment Logistics Ship Project; that the Jacksonville area has for years been the site of many activities of the United States Navy and has contributed thereto and benefited therefrom, and the construction and acquisition of the said Special Purpose Facilities and the lease of such facilities by the Authority to Tenant will directly contribute to the development of the public port and shipping facilities of the Authority and will generally benefit the Jacksonville area and the State of Florida and will contribute directly to the national defense."
Objecting to the decree of validation, the State contends solely that the proposed Authority bonds considered in relation to the terms of the Lockheed lease would be violative of Section 10, Article IX of the State Constitution, F.S.A., because the bonds would be issued to obtain money to construct and acquire said facilities primarily for Lockheed's benefit on the credit of the Authority.
And so it is that once again we are confronted with the above identified section of the Florida Constitution which provides, "The credit of the State shall not be pledged or loaned to any individual, company, corporation or association * * * The Legislature shall not authorize any county, city, borough, township or incorporated district to become a stockholder in any company, association or corporation or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual." This section was first adopted in 1875 as an amendment to the Constitution of 1868. Its purpose was to stop the practice of public bodies becoming stockholders or bond holders and in other ways loaning their credit to and becoming interested in the organization and operations of railroads, banks and other commercial institutions. Many of these enterprises were poorly managed and failed, resulting in such governmental entities as were interested therein in becoming responsible for their debts and other obligations, which obligations fell ultimately on taxpayers.[1] This section has come down to us in substantially the form in which it first existed in 1875.
The question of whether the public welfare will be promoted by the issuance of public securities to finance or aid in the financing or the construction and operation of private enterprise as is presently being done in some states under specific constitutional or statutory provisions is not for this *883 Court to decide. Perhaps the modern trend of government encroachment on the free enterprise system is the wise road to follow. So long, however, as the Constitution reads as it does now, it seems clear that we have no choice in the matter. The most recent decision of this Court in this area is State v. Manatee County Port Authority decided in January of this year.[2] There is no difference whatever in the principle involved in the Manatee case and in this case. If anything, the record here establishes a far more direct extension of public credit and facilities to this private corporation than was proposed in the Manatee County case.
In the past fifteen years a majority of this Court has consistently adhered to the mandates of this section of the Constitution when confronted by proposals to issue public securities in which the private interests to be served by the overall project was more than incidental.[3] The cases are legion in which this Court has flatly refused to approve the issuance of public securities for the purpose of assisting in the establishment of industrial developments, housing projects, building apartment houses, baseball stadiums and projects of such nature, no matter how worthy the objectives might have been in such cases where the benefit to the public was shown to be only incidental. The dissenting opinions which have been filed in many of these cases are the best evidence of the fact that this Court has limited the issuance of such public securities to those instances where the private purpose served [if any] was purely incidental such as that which existed in the Gate City case in Jacksonville,[4] the Panama City case[5] and many others.
It is said in some of the dissenting opinions that this Court has not been consistent in its views upon the subject. The basic principle involved has been consistently adhered to. The factual issue, however, of whether the public purpose was the overriding and paramount purpose has evoked dissension in the Court from time to time. The cleavage, if any, lies in this area.
What, now, are the facts in this case? The Authority claims power to issue these bonds under Chapter 63-1447, Laws of Florida, Acts of 1963, which confers upon it the "power to construct, acquire and operate shipping facilities of all kinds, to lease the same on such terms, conditions and period of time as the Authority may determine" and "to solicit shipping and other business and do all things necessary or advisable to promote commerce and increase tonnage through the Port of Jacksonville." To accomplish these purposes, the Authority is authorized "to issue revenue bonds, to pay all or part of the costs of acquisition or construction * * * of any project and to pledge the revenues to secure the payment of bonds." This language does not authorize the project being undertaken. The language clearly indicates the conferring of authority to carry on the public purpose of operating a port for the promotion of commerce. In connection *884 therewith, of course, there exists the necessity of the construction of buildings, wharves, docks and other things to attain that purpose. Admittedly such is a public purpose the same as building sewers, highways, operating police departments, fire departments and performing any other essential public function. Shipping and commerce and transportation are essential public services. But that is not what is contemplated here.
In numerous decisions of this Court beginning with Gate City Garage v. Jacksonville,[6] this Court laid down the principle that if the paramount purpose is a public purpose, such project may as an incident thereto lawfully benefit private corporations or individuals. In each of the cases where this was discussed, notably in Panama City v. State,[7] this Court went at length into the question of the percentage of the project which was devoted to necessary public purposes. In the Panama City case we said that rentals from concession buildings amounted to slightly less than 20% of the total anticipated revenue from the overall project and that such concession buildings would occupy 1.22% of the total area involved. We held that such were "mere incidents to the main or primary purpose and for the convenience of those who used the buildings and facilities for a public purpose."
In this case it is said that up to this time approximately $35,000,000 has been expended in the total harbor development of the Port of Jacksonville by both the federal and local authorities. At the present time the Authority has outstanding something less than $5,000,000 in improvement bonds. It has been authorized by popular freeholder election to issue an additional $25,000,000 of bonds which, according to the record here, were voted for the purpose of improving Blount Island, which is the principal territory involved in this case. Not all of these bonds, according to this record, have been sold. The proposed issue of bonds of $111,000,000, is many times the total of the Authority's current obligations. Every dollar raised by the issue here involved is to be used for the purpose of building a shipyard for the private use of a private corporation. The public will have utterly no control or dominion of these facilities for profit for a possible period of 75 years. In addition to this, the Authority by the supplemental agreement appearing in the record has obligated itself to use all or such portions as are necessary of the $25,000,000 general obligation bonds already authorized for the purpose of constructing and paying for, (such amounts not to be refundable by Lockheed) bridges, temporary highways, railroad tracks, water supplies, electric power, fire fighting equipment and the construction of permanent bridges and highways leading to these facilities. So, in all, the contemplated expenditure of these public funds will amount to approximately $136,000,000, and this does not include such supplemental projects as from time to time might be authorized.
It is noteworthy and highly pertinent to observe the conditions of the lease and the supplemental agreement with reference to the complete control of this project by this private corporation for three-quarters of a century. Moreover, in the actual expenditure of these public funds, a careful study of the supplemental agreement and the lease reveal that decisions in connection with it are not made solely by the Authority. In the event of disputes, certain designated nationally recognized engineering firms, named in the agreement, are the ultimate authority.[8]
*885 An examination of the record clearly establishes that the only public purpose to be served by this project is the promotion of the Port and the general welfare of the area served by increasing payrolls, providing employment, etc., which this Court has said is not a public purpose as contemplated by our decisions and the Constitution.[9]
*886 Finally, while the problem so far as this Court is concerned is answered in the constitutional language, the issuance of public securities of this nature does not so far appear to be essential to the general welfare or the development of this state. Within the past few weeks Disney Enterprises has commenced a project which it is said will ultimately entail the expenditure of more than 600 million dollars. This Court can take judicial knowledge of the Martin complex in Orange County, Westinghouse and Anheuser-Busch in Hillsborough County, Honeywell in Pinellas County, Pratt & Whitney in Palm Beach County and many others including pulp mills, paper plants and phosphate plants, all of which so far as the records of this Court show have moved into this state without the aid of financing of the nature here proposed. Moreover, in 1966 this state added 397 new plants and 156 major plant expansions yielding 33,223 new jobs.[10] These facts establish that Florida has prospered and continues to grow and prosper under the free enterprise system. It confirms the wisdom of our forefathers nearly a hundred years ago in writing into the Constitution one provision which to this date remains unchanged.
The questioned decree, for the reasons herein pronounced and on the authority of previous decisions of this Court, is hereby reversed with directions that the petition for validation be dismissed.
It is so ordered.
CALDWELL, C.J., and THOMAS and O'CONNELL, JJ., concur.
ERVIN, J., dissents with opinion.
ROBERTS and THORNAL, JJ., dissent and concur with ERVIN, J.
ERVIN, Justice (dissenting).
I conclude the State's objection to the proposed bonds should be disallowed and the validation decree affirmed. This conclusion is reached notwithstanding the facilities are to be operated by Lockheed under the lease because thereunder they will serve primarily the public purposes of the Port Authority. Consequently, there is no constitutional inhibition to the issuance of the proposed Authority bonds to finance the construction and acquisition of such facilities.
The Special Purpose Facilities will be necessary adjuncts, apparatus and appurtenances to the Port Authority's program for the successful operation and expansion of the Port of Jacksonville. According to the record evidence, they will provide modern ship servicing and ship construction requirements vital in meeting increasing needs of maritime shipping in the Port of Jacksonville and in contributing to the national defense.
Ch. 63-1447 created the Jacksonville Port Authority and gave it the power to construct, acquire and operate shipping facilities of all kinds, to lease the same and "to solicit shipping and other business and do all things necessary and advisable to promote commerce and increase tonnage through the Port of Jacksonville." To accomplish these things the Authority is authorized to issue revenue bonds.
*887 The Jacksonville harbor facilities have been under improvement since 1870. Federal and local harbor improvements at the Port have cost more than $35,000,000.00. Public owned Port terminal facilities constructed by the City of Jacksonville in 1915, including later additions and improvements were taken over by the Authority in 1963. Since then the Authority has expended, or has been authorized to expend, over $29,000,000.00 for the improvement and expansion of Port terminal facilities; $25,000,000.00 of which was authorized by issuance of general obligation bonds of Duval County.
The creation of the Jacksonville Port Authority occurred contemporaneously with the acquisition by Duval County of Blount Island which lies upriver in the St. Johns. The public motivation behind the creation of the Authority and the acquisition of the Island was to upgrade and expand the operation of the Port after it passed from City management to new management under the aegis of the Authority. This involved combining old docks and terminals in the city proper lying off Talleyrand Avenue with port facilities proposed to be located on Blount Island  a complex integral system consisting of both publicly and privately operated port facilities.
There is evidence that maritime shipping in the Port is increasing rapidly and will be further augmented by the completion of the Florida Cross State Canal whose northern terminus is the Port of Jacksonville.
A showing was made in the evidence that deepening of the present harbor channel in the Port of Jacksonville from 34 feet to 38 feet has been approved by the U.S. Army Corps of Engineers and is under serious consideration by the Congress. If the deepening is authorized, as appears likely, it is urged the deeper channels will further increase Port traffic  which justifies the anticipated need for the Special Purpose Facilities. In this regard it was shown that all new seagoing tankers being constructed and those on the drawing boards are of larger and longer design requiring channel drafts beyond the present depth of the Port's channels. Therefore, the Authority submits that in order for the Port to keep pace with the servicing needs of deeper draft tankers it requires the proposed major port special facilities. Installation of the proposed facilities would assure the Congress the Port will satisfy ship servicing requirements of a modern deep draft channel port and further justify Federal harbor appropriations for deepening of Port channels. Prominent in giving early assurance to the Congress is the Authority's timely action here related in making provision for the Special Purpose Facilities.
To illustrate the size and magnitude of the proposed special purpose facilities which the evidence demonstrates are required for a modern port of the potential of the Port of Jacksonville, it is noted from the evidence the main production building will cover 20 acres; the shop and storage building, 23 acres. There will be 46 cranes, including two 200-ton gantry cranes that will reach the length of a football field and clear a 13-story building. The Authority contends the implementation of this mammoth capital venture, its financing, its successful operation and debt liquidation require the combined efforts of public and private sources at all stages.
The maritime repair business offered Jacksonville is 90 per cent tanker trade due to the geographic location of Jacksonville on the Atlantic seaboard. The evidence demonstrates the proposed special facilities will considerably stimulate dry docking and marine repair business at the Port. The special facilities are also expected to be used by Lockheed in the construction of Fast Deployment Logistic Cargo (FDLC) ships for the Navy at a peak production of one ship per month and for the repair, overhaul, conversion and maintenance of ships generally, including jumbo or supertankers and aircraft carriers home-ported *888 at the Naval Station located at Mayport, Duval County, Florida.
The construction of a large number of the FDLC ships for the Navy in the shipyard of the Special Purpose Facilities would serve a national defense purpose. These ships are in great demand by the Navy. They are of a design, 15 stories high and three football fields long, to accommodate fast shipment of immense quantities of military materials which can be stored aboard and maintained in condition to be driven or flown off for immediate combat use. These ships can be located and maintained for long intervals at sea near combat areas so as to reduce to a minimum the time required to supply the armed forces.
The foregoing considered, I conclude the benefit to Lockheed, though substantial, is incidental to the greater public purpose of fostering and speeding the development and expansion of the Port through utilization of existing Port docks and terminals in conjunction with the facilities proposed to be placed on Blount Island. The fortuitous circumstance that Lockheed expects to contract with the Navy for the construction of the FDLC ships at Blount Island fits in and advances the overall program of the Authority to expand and modernize the Port. The FDLC ship construction program is not incompatible with the public purpose; instead, it furthers it by making it financially feasible to provide concomitantly shipyard and repair services for the shipping public.
From an early date our Court has held that development of harbor and port facilities constitutes a public purpose. See Stockton v. Powell (1892), 29 Fla. 1, 10 So. 688, 15 L.R.A. 42; Board of Com'rs of Escambia County v. Board of Pilot Com'rs of Port of Pensacola (1906), 52 Fla. 197, 42 So. 697; Martha Bright Farms, Inc. v. Broward County Port Authority (1934), 117 Fla. 361, 158 So. 70.
While the facilities are to be leased to Lockheed, a private corporation, for their more practical operation in private industry, the private benefit arising from the lease is only incidental to the greater public benefit the facilities will produce for the Port and the Authority's program of expansion. Furthermore, we are advised that servicing of the kind to be provided by using the Special Purpose Facilities is ordinarily performed in seaports by private industry in cooperation with port authorities.
There exists a clear interdependence between the proposed special facilities and the Port's public purposes, viz., in providing dry docking, overhaul, conversion and ship repair services to maritime shipping generally  and perhaps more importantly, in fostering and speeding the development of Blount Island as an integral unit of the Port by the construction and operation of the Special Facilities there. The greater degree of servicing to be provided by the installation and operation of modern facilities at Blount Island will attract more commerce and tonnage for the Port, as, for example, larger vessels, including jumbo and supertankers and Naval aircraft carriers and other large Naval vessels home-ported at Mayport, Florida.
The benefit to Lockheed, though substantial, is incidental to the predominant public port purposes which will be furthered by the installation and operation of the special purpose facilities in terms of seaport servicing of maritime shipping generally, in aiding national defense, in promoting greater commerce and increasing ship tonnage in the Port and in expanding and developing the Port of Jacksonville into a truly modern port capable of keeping abreast of the evolution in maritime shipping. Compare State v. Inter-American Center Authority (Fla. 1955), 84 So.2d 9; State v. Board of Control (Fla. 1953), 66 So.2d 209; Martha Bright Farms, Inc. v. Broward County Port Authority, supra; Panama City v. State (Fla. 1957), 93 So.2d 608.
In Panama City v. State, supra, the State argued that the leasing of concessions *889 buildings to private parties in two contemplated public marinas deprived the project of its public character. The argument was that the private benefit was so substantial that the case did not fall within the exception to the rule permitting private benefit incidental to a public purpose. This Court rejected the argument because the
"facilities of the kind contemplated are a necessary adjunct to the successful operation of the main enterprise, namely the marina. * * * The main factor, as we view it, is that these concessions buildings and the businesses to be operated therein are required to insure the success of the main undertaking." (93 So.2d at 614)
The continued existence of the Port of Jacksonville as a major port depends upon the availability of ship repair services for the large tankers and Naval vessels, the deepening of the harbor channel to accommodate these large ships and a steady flow of commerce and tonnage through the port. All of these things, necessary to the port, can be greatly furthered through the construction and acquisition of the Special Purpose Facilities. Viewed in this light, the private benefit is only incidental and the public benefit derived from developing Jacksonville as a major world port is paramount.
In State v. Dade County (Fla. 1953), 62 So.2d 404, the Dade County Port Authority proposed to issue $750,000.00 in revenue certificates for the construction of a warehouse and overhaul shop at the Miami International Airport and to lease the same to National Airlines, Inc. We held that the county was fully authorized to enter into the lease agreement and issue the revenue certificates. Although the Court's opinion in the Dade County case did not expressly refer to the public purpose issue, the decision in that case has been cited by us as holding that the construction and leasing of the warehouse and overhaul shop was for a public purpose because the airport, which the warehouse and overhaul shop augmented, was publicly owned and operated and served a public purpose.
This principle was again followed in State v. Okaloosa County Airport and Industrial Authority (Fla. 1964), 168 So.2d 745, in which the Authority sought to validate revenue certificates for the construction of facilities for the repair, maintenance and care of aircraft using the Authority's airport. These facilities were to be leased to Fairchild-Stratos Corporation. We held that the project was for a public purpose because there was a "clear interdependence" between the repair facilities and the airport. We stated:
"The facilities proposed by the Authority in the case at bar constituted an additional and direct benefit to the public by improving service at the local airport, the adequate provision of which is the primary public purpose. Clearly, there is an interdependence between the Auththority's airport and the facilities proposed for the repair, maintenance and care of the aircraft of the flying public using said airport. For example, runways on a public airport are not the only facilities essential to the functional operation of an adequate airport. A number of other facilities and aids are essential, including those contemplated in the project here. * * *" (168 So.2d at 746-747)
Thus, in cases involving an established public project, additional facilities publicly financed and leased to private enterprise are for a public purpose if the new facility has the effect of improving and expanding the services of the established public project. Clearly, Appellee's plan for the construction and acquisition of the Special Purpose Facilities falls within this rule. The Port of Jacksonville serves a public purpose in the same manner as do the Miami International and the Okaloosa County airports. By reason of the fact that Lockheed Aircraft Corporation plans to use the facilities to provide ship repair facilities to the public, the Special Purpose *890 Facilities will improve the services offered the shipping public and the United States Navy by the Jacksonville Port Authority.
This case is unlike State v. Manatee County Port Authority (Fla. 1966), 193 So.2d 162. In that case the Manatee County Port Authority proposed to validate $18,500,000.00 in bonds for the construction of port facilities to load phosphate. Ninety-eight per cent of the improved land was to be devoted to the construction of a phosphate loading facility and the same was to be leased to two railroads for their exclusive use for forty years, with the privilege of renewal for a like period. A majority of this Court held that the project was not a genuine improvement for a public purpose, since the public benefit was only incidental to the private benefit of the railroads. In contrast to the established Port of Jacksonville, there was no existing public port in Manatee County to which the construction and lease of the phosphate loading facility could be considered incidental. Under the lease in this case Lockheed will not operate the Special Purpose Facilities primarily for its private purposes independent of the public purposes and functions of the Port. In the Manatee County Port Authority case it was found the railroads were to be provided the phosphate loading facilities at the new port on the borrowing credit of the Authority primarily because the railroads preferred to use such facilities for the private benefit inuring to their common carrier transportation of phosphate. The railroads, unlike Lockheed, were not required or expected to provide any special services in behalf of the Port for maritime shipping generally therein which is normally provided in the overall functioning and operation of a major seaport. The contribution the railroads offered for the successful operation of the Manatee County Port was found only incidental to the greater private benefit they were to receive in behalf of their common carriage of phosphate. In the instant case Lockheed is to be directly involved in the functional operation of the Port itself in providing services recognized as essential to the successful operation of a modern seaport.
It is unrealistic to assume that the proposed pledge of the Port's credit would violate Section 10, Article IX of the State Constitution on the theory the pledge would be primarily for the benefit of Lockheed, a private concern; or that to do so would set up a private ship building and servicing monopoly in Lockheed; or would give tax exempt status to the Lockheed operated facilities for a great number of years.
Numerous cases beginning with Bailey v. City of Tampa, 92 Fla. 1030, 111 So. 119, have distinguished commercial enterprises for private profit proposed by public bodies, the financing of which is forbidden public bodies by Section 10, from public purpose projects. The following are case examples in addition to others already cited herein of public projects which were found not to violate Section 10: Construction of an automobile speedway facility, State v. Daytona Beach Racing & Rec. Fac. Dist. (Fla.), 89 So.2d 34; construction of a warehouse to be leased to the Orange Bowl Committee of Miami for the purpose of storing floats, material and equipment necessary for the Orange Bowl festival and pageant, State v. City of Miami, Fla., 72 So.2d 655; appropriating state funds to the first accredited private medical school established in the state, Overman v. State Board of Control (Fla.), 62 So.2d 696; construction of recreational facilities which could be leased out to private enterprises, State v. Escambia County (Fla.), 52 So.2d 125; constructing an auditorium, stadium, boat basin and recreational center, State v. City of Daytona Beach, 160 Fla. 13, 33 So.2d 218; state advertising to promote the citrus industry, C.V. Floyd Fruit Co. et al. v. Florida Citrus Commission, et al., 128 Fla. 565, 175 So. 248, 112 A.L.R. 562; construction of an office by the City of Tallahassee for rental purposes, State v. City of Tallahassee, 142 Fla. 476, 195 So. 402; construction of an Inter-American Cultural and Trade Center in which numerous buildings and facilities *891 will be rented to lessees for their private business purposes, State v. Inter-American Center Authority (Fla.), 84 So.2d 9.
Among the cases decided by our Court, I note that such different things as golf courses, race tracks, fraternity houses, trade marts, concessions, fishing piers, marinas, garages and filling stations, airports, overhaul and repair facilities for aircraft, airport hotels and urban renewal private housing have been found to serve public purposes, notwithstanding they have either been leased or sold to, or used or operated by private persons or companies for private profits or private purposes.
The cases decided by our Court dealing with facilities most closely parallel to the special purpose facilities proposed by the Port Authority are the cases where airport overhaul, repair and service facilities were approved by us for the Miami International Airport and the Okaloosa County Airport. Such facilities were leased to private concerns and used by them in earning private profits by servicing and repairing commercial and other private aircraft at such airports. Under the Port's plan, Lockheed will provide overhaul, repair and other servicing of ships in the Port of Jacksonville, as National Airlines similarly now provides servicing for aircraft at Miami International Airport.
The proposed Port bonds are not private industrial or development aid bonds designed generally to promote the economy of the Jacksonville community by aiding industrial progress as, for example, were the bonds proposed in State v. Town of North Miami (Fla.), 59 So.2d 779, and State v. Clay County Development Authority (Fla.), 140 So.2d 576. They are to be issued to finance special facilities necessary and essential to the successful functioning and operation of the Port itself in directly providing overhaul, repair and maintenance service for maritime shipping in the Port of Jacksonville.
The claim of a monopoly in Lockheed is not urged by the State in objection to the validation. This suggestion is unsupported by anything except speculation.
The suggestion there is to be a long-time tax exemption of the proposed leased special facilities benefitting Lockheed is still another unsupported conjecture. In Daytona Beach Racing and Rec. Fac. Dist. v. Paul (Fla.), 179 So.2d 349, it was held taxation of the automobile speedway, bond financing for which was approved in 89 So.2d 34, is a subject remaining open for legislative determination at each session under the State Constitution. I see no reason why the same rule would not apply with regard to the special purpose facilities.
The construction by Lockheed of the FDLC ships for the Navy for the purposes stated serves a paramount national defense purpose. For many years the Government has turned to private contractors to build and supply most of the materials and equipment for the armed services. It is recognized in law such construction serves a public or national purpose. Thus, the construction and lease of the Special Purpose Facilities to Lockheed Aircraft Corporation for the construction of Naval ships will be a cooperative effort on the part of the United States Navy, the Jacksonville Port Authority and private enterprise in the interest of national defense. Presently, major overhaul and repairs on the Navy's capital ships, including those berthed at Mayport, Florida, must be accomplished in Boston, Philadelphia or Norfolk.
Obviously, the construction and repair of ships for the United States Navy is in the interest of national defense, which of itself and without regard to other considerations, is sufficient to constitute a public purpose. In State ex rel. Gibbs v. Gordon (Fla. 1939), 138 Fla. 312, 189 So. 437, the Legislature had established the Duval County Air Base Authority for the purpose of aiding the United States Government in its program of national defense by acquiring and paying for lands for the establishment of a naval air base. The Air Base Authority proposed to issue bonds payable from a special tax *892 levy. This Court, in ruling on contentions that the issuance of the bonds would be contrary to the State Constitution, held that the national defense is not exclusively a Federal function or responsibility precluding cooperation from and by the states and that
"* * * a governmental project may respond to a municipal, county, state or federal purpose or all may coalesce in the same project but that fact does not inhibit the County, State, or the Federal Government, any one, or all of them from contributing to it. This Court takes judicial knowledge of the fact that the expenditure of many millions of dollars for a defense project in a locality or County such as we are here concerned with will redound in material values to Duval County and the State of Florida. The fact that the product of the expenditure is a great defense medium for the Federal Government is no bar to the State and the County contributing to it when it results in material development in which they are the beneficiaries. (Citing cases.)" (at 440)
Thus, the construction and acquisition of the proposed Facilities will serve a public purpose in augmenting the port facilities available to the general public, as well as to the United States Government, and will contribute substantially to the national defense.
I believe the Port Authority has amply demonstrated the wisdom and need for the special purpose facilities, and that such facilities not only will provide for overhaul, repair and routine servicing, but will aid the national defense. I see no good reason for refusing to allow the Port Authority to take advantage of the fortunate circumstance that the Navy requires the FDLC ships for national defense and provide the shipyard special facilities to Lockheed for FDLC ship construction as a reasonable and logically related Port program which would speed the development of the Port.
The Port Authority should not be denied the right to provide the special purpose facilities to meet the clearly demonstrated servicing and overhaul needs  the special service needs of coastwise and Naval sea-craft which would be attracted in greater numbers to the Port of Jacksonville. The Port Authority has the statutory power to provide such special facilities for the overhaul, repair and servicing of ships as an essential port function and as a stimulant to increase commerce and ship tonnage into the Port. It can operate such facilities under its own management but perhaps wisely has determined it is better for the facilities to be leased to a private industrial concern for operation.
Unquestionably these facilities will serve paramount public purposes in advancing the development of the Port of Jacksonville into a major seaport on the Atlantic seaboard. To me, it is extremely doctrinaire and unrealistic not to follow our precedents, particularly the cited airport cases, and validate the bonds. The Port Authority has clearly demonstrated its proposed project falls within exceptions to the prohibitions of Section 10, Article IX, which exceptions we have so often recognized. I think it is a grave and damaging mistake not to accord to the wisdom and judgment of the local Port officials, in behalf of their progressive and enlightened Port expansion program the consideration and deference we have so often given in analogous situations.
ROBERTS and THORNAL, JJ., concur.
PER CURIAM.
The Court has carefully considered the petition for rehearing filed herein by the Jacksonville Port Authority, appellee, and has visited said petition for rehearing to the revised opinion.
That portion of the petition for rehearing relating to legislation passed subsequent to the date of the original opinion has been considered. In view of our conclusion that *893 the issuance of these bonds is prohibited by the Florida Constitution, such subsequent legislation has no effect upon the conclusion which we reach.
The petition for rehearing as visited to the revised opinion is accordingly denied.
CALDWELL, C.J., THOMAS, DREW and O'CONNELL, JJ., concur.
ROBERTS, J., dissents.
THORNAL, J., dissents with Opinion.
ERVIN, J., dissents and agrees with THORNAL, J.
THORNAL, Justice (dissenting):
I would grant the petition for rehearing and recede from the original opinion of the majority.
ERVIN, J., agrees.
NOTES
[1] Bailey v. City of Tampa, 1926, 92 Fla. 1030, 111 So. 119.
[2] Fla. 1966, 193 So.2d 162.
[3] Less than 6 months ago, this Court said:

"* * * We have repeatedly held that use of part of the proceeds of such bonds for incidental private operations will not vitiate the entire issue, but we have reiterated the restriction that diversion of any part of the funds will not be tolerated unless the expenditure is purely incidental to the main project. Such were the effects of the decisions in Adams v. Housing Authority of City of Daytona Beach, Fla., 60 So.2d 663; Gate City Garage, Inc. v. City of Jacksonville, Fla., 66 So.2d 653; Panama City v. State, Fla., 93 So.2d 608; State v. Clay County Development Authority, Fla., 140 So.2d 576, and in the later case of State v. Washington County Development Authority, Fla., 178 So.2d 573, and in the recent case of Brandes v. City of Deerfield Beach, Fla., 186 So.2d 6." State v. Manatee County Port Authority, note 2, supra.
[4] Gate City Garage, Inc. v. City of Jacksonville, Fla., 66 So.2d 653.
[5] Panama City v. State, Fla., 93 So.2d 608.
[6] Note 4, supra.
[7] Note 5, supra.
[8] The following are a few quotes from the supplemental agreement with reference to the management of construction and acquisition of the special purpose facilities:

"To assure the orderly completion of the Special Purpose Facilities, the Authority and Tenant shall each appoint a project engineer and an assistant project engineer (the project engineers so designated by the parties are hereinafter collectively referred to as the `Project Engineers') to supervise the development, acquisition and construction of the Special Purpose Facilities. The persons so designated by each party may be changed at any time upon written notice of such change to the other party. In the absence of the project engineer of either party at any time, the assistant project engineer of either party shall be entitled to act as the project engineer of that party.
"In addition, the Authority will employ and retain Tenant to manage the development, acquisition and construction of the Special Purpose Facilities. * * *
"The Authority recognizes that Tenant has employed Bechtel Corporation (`Bechtel') a nationally recognized engineering firm, to assist Tenant in designing and engineering the Special Purpose Facilities. Tenant may delegate certain portions of its duties in the management of the development, acquisition and construction of the Special Purpose Facilities to Bechtel or such other qualified experts as Tenant may select. The amounts paid by Tenant to Bechtel or such other qualified experts on account of such services shall be a part of Tenant's `expenses' which are reimbursed by the Authority.
"The Project Engineers shall develop contracting, procurement, operating, supervisory, and auditing procedures to control and implement the acquisition and construction of the Special Purpose Facilities, utilizing the services of Tenant as the manager of the development acquisition and construction, wherever the Project Engineers deem appropriate. * * *
"* * *
"In the event the Project Engineers are unable to agree upon the proper course of action to be taken in any matter relating to the acquisition and construction of the Special Purpose Facilities, they shall consult with the designated representative of Bechtel or such other nationally recognized engineering firm as the Authority and Tenant may select. The course of action determined by a majority of the representatives of the Authority, Tenant, and Bechtel or such other selected engineering firm shall be followed by the Project Engineers."
In this connection, see the following language in the Manatee County case:
"From its inception, this arrangement appears to be one to use public funds to assist and enhance private enterprise. As we interpret the lease, it is a grant to the railroads of exclusive use of the facilities at public cost. This thought is emphasized by certain provisions with reference to supervision by the lessees of even preliminary steps in the financing as well as eventual construction of the facility. For example, it is provided in the lease that if the lessees shall `in good faith fail to approve of any proposed sale of such Bonds, either the Port Authority or the Lessees may cancel this lease and both * * * shall be released from all claims for damages resulting directly or indirectly from such cancellation.' Furthermore, it is stipulated that the `Lessees shall have the right to approve the terms of the sale of the Bonds * * * to finance the construction costs of the Leased Premises' and if they fail in good faith to give their approval they may cancel the lease and be released of all damages flowing from the cancellation. And finally the lessees are given the right to audit the records of the Authority `concerning all elements of the Construction Costs * * *.'"
[9] * * The dominant and paramount purpose is to lend the credit of the county to a private corporation to finance a private enterprise for private profit which will be under the exclusive control and in the exclusive possession of such enterprise for more than twenty-five years. The only possible public purpose which it serves is to promote the general development of the area by furnishing employment to the residents of Clay County. This is the factor which prompted the project. If we approve the issuance of bonds by the public authorities of this State to build and finance private enterprises and put such enterprises in the exclusive possession and control of such leases as is proposed to be done here, in order to alleviate unemployment and to promote the economic development of the area, then there is no limit to the extent to which the credit of the State and its authorities may be extended to private interests. In such event the constitutional provision above quoted will become meaningless." State v. Clay County Development Authority, Fla., 140 So.2d 576, 580.
Also see State v. Suwannee County Development Authority, Fla., 122 So.2d 190, and State v. Washington County Development Authority, Fla., 178 So.2d 573, 574, where we said:
"Laudable as is the effort of the people to lift their locality to a more prosperous condition by their own bootstraps, so to speak, we do not think it can be done within the framework of our laws. Sec. 10, Art. IX, seems completely to bar the way."
[10] Press release of Florida Development Commission issued May 18, 1967.