529 So.2d 250 (1988)
STATE of Florida, Appellant,
v.
CITY OF PANAMA CITY BEACH, Appellee.
No. 70161.
Supreme Court of Florida.
May 26, 1988.
James P. Appleman, State Atty. and Alton O. Paulk, Asst. State Atty., Fourteenth Judicial Circuit, Marianna, for appellant.
W. Robert Olive, Elise F. Judelle and Randall W. Hanna of Bryant, Miller and Olive, P.A., Tallahassee, for appellee.
Rowlett W. Bryant of Bryant, Higby & Williams, Panama City, and Thomas B. Slade III of Foley & Lardner, Jacksonville, amicus curiae for City of Panama City, Fla.
PER CURIAM.
The state appeals a circuit court order validating certain bonds which Panama City Beach proposes to issue. We have jurisdiction under article V, section 3(b)(2) of the Florida Constitution.
In January 1987 the city commission adopted a resolution authorizing, pursuant to chapter 166, part II, Florida Statutes (1985), the issuance of up to $300,000,000 in "investment" revenue bonds. According to the terms of the trust indenture, the bulk of the proceeds from the sale of the bonds will be invested with an insurance company or other investment institution having an appropriate credit rating. The investment contract is to have a guaranteed rate of return. The principal invested in the contract plus the earnings thereon will be pledged as security for repayment of the bonds and will constitute the sole source for that repayment. The proceeds will be sufficient to retire the bonds at maturity. The resolution also provides that the bonds will not constitute a general indebtedness of the city and that the bondholders cannot look to the taxing and assessing powers of the city or the state for repayment. The interest paid to the holders of these bonds will not be exempt from federal taxation.
Testimony at the validation hearing indicated that the amount owed on the bonds is expected to be one-half of one percent less than the interest received from the investment contract. This difference would produce a profit for the city of approximately $1,500,000. The profit thus realized on this bond issue would be used for park and recreational facilities, self-insurance reserves, or other municipal purposes, all to be designated by subsequent resolution. At the hearing the parties claimed that this is a case of first impression for validation of investment revenue bond, commonly called "arbitrage" bonds, in Florida.
Arbitrage bonds apparently grew out of a bond refunding scheme developed in Phoenix, Arizona, by the city and its bond dealer in 1961. Mumford, Arbitrage and Advance Refunding, 1976 Duke L.J. 1239. By using the proceeds of relatively low-interest *251 tax-exempt bonds to purchase federal securities paying a higher rate of interest, local and state governmental entities could make a profit on their bond issues. Arbitrage bonds exploit the federal tax exemption because the federal government must pay higher interest on its securities than is paid on local tax-exempt bond issues but receives nothing back through the income tax. Thus, in effect, the federal government subsidizes local governments. The Tax Exempt Status of Local Government Bonds Used in Arbitrage Transactions, 35 Geo. Wash. L.Rev. 574 (1967). The Treasury Department and the Internal Revenue Service began studying this new type of bond, and in August 1966 the IRS issued Technical Information Release 840, stating that it would stop issuing rulings on the tax-exempt status of arbitrage bonds. Without a favorable tax-exempt ruling local bonds are difficult to sell. Later IRS regulations and amendments to the federal tax code increased the restrictions on arbitrage bonds. Zarin, Tax Exemption of Municipal Bonds  A Report on Recent Developments, 1 Urb. Lawyer 336 (1969); Goldberg, The New Proposed Arbitrage Bond Regulations  And a Comparison with the Old, 6 Urb. Lawyer 48 (1974); Lane and Schwarz, New Proposed Arbitrage Regs. Require Revised Approaches to Refunding Issues, 46 J. Tax'n 358 (1977). These new regulations decreased the desirability of arbitrage bonds by sharply restricting the amount of profit an issuing agency could receive and still maintain the tax-exempt status of its bonds. See McCroskey v. Gustafson, 638 P.2d 51 (Colo. 1981). The instant bonds are not tax exempt so they may not face some of the restrictions on arbitrage bonds. They do, however, have to pass this Court's scrutiny.
As the parties state, this appears to be the first time arbitrage bonds have come before this Court. Neither the city nor the state has cited a Florida arbitrage bond validation case, and this Court has been unable to find one. An examination of the controlling constitutional and statutory provisions, as well as case law, governing bond issues is, therefore, in order.
The scope of judicial inquiry into bond validations is sharply limited. State v. City of Sunrise, 354 So.2d 1206 (Fla. 1978). Limited does not mean nonexistent, however, because a court must determine if a public body has the authority to issue the subject bonds, must determine if the purpose of the obligation is legal, and must insure that the bond issuance complies with the requirements of law. Taylor v. Lee County, 498 So.2d 424 (Fla. 1986). This includes determining "whether the [issuing] agency may legally expend the proceeds for the contemplated purpose." State v. Suwannee County Development Authority, 122 So.2d 190, 193 (Fla. 1960); State v. Miami Beach Redevelopment Agency, 392 So.2d 875 (Fla. 1980).
The main question presented here is whether these bonds are for a proper municipal purpose. The city argues that providing parks and recreational facilities and funding a self-insurance program are valid municipal purposes. Therefore, according to the city, the city's obtaining assets for public purposes by serving as a financial conduit is permissible. The state, on the other hand, claims that the future recreational facilities and self-insurance programs are merely secondary and incidental purposes of this bond issue while the immediate and primary purpose is the acquisition of an investment for the city. The state contends that the city is borrowing money primarily for the purpose of investments which is not a recognized municipal function.
Governmental entities have sought to issue revenue bonds for many and diverse projects. They have become popular vehicles for public borrowing for several reasons. Because they are not supported by the full faith and credit of the issuer, revenue bonds do not have to be submitted to the electorate for approval. Moreover, revenue bonds are not considered to be, strictly speaking, debts of the issuer. Patterson, Legal Aspects of Florida Municipal Bond Financing, 6 U.Fla.L.Rev. 287, 316 (1953); B.U. Ratchford, American State Debts (1941). See Wilson v. Palm Beach County Housing Authority, 503 So.2d 893 *252 (Fla. 1987); State v. City of Miami, 113 Fla. 280, 152 So. 6 (1933). Thus, they can also be used to circumvent constitutional debt limitations.
The constitution contains numerous provisions dealing with bonds. Article VII, section 11(a) of the state constitution requires a vote of the electorate on state bonds pledging the state's full faith and credit and limits the "total outstanding principal" of such state bonds to "fifty percent of the total tax revenues of the state for the two preceding fiscal years." Revenue bonds, on the other hand, are to "be payable solely from funds derived directly from sources other than state tax revenues" and do not have to be voted on by the electors. Art. VII, § 11(d), Fla. Const. Local bonds can be issued to finance or refinance capital projects authorized by law when approved by the electorate or to refund outstanding bonds. Art. VII, § 12, Fla. Const. State bonds can be issued for pollution control and abatement and other water facilities. Art. VII, § 14, Fla. Const. Revenue bonds, when authorized by law, can be issued for financing or refinancing capital projects for airports or port facilities and for industrial or manufacturing plants, for scholarship loans, or for housing and related facilities. Art. VII, §§ 10(c), 15, 16, Fla. Const. The constitutional authority to issue such bonds is a far cry from previous state constitutions.
Florida has a checkered history regarding bonds. As a frontier state it issued bonds to promote the building of railroads and canals, most of which failed or were destroyed. Florida repudiated its bonds numerous times in the mid-1800s and after the Civil War. B.U. Ratchford, American State Debts (1941); A.J. Heins, Constitutional Restrictions Against State Debt (1963); Patterson, Legal Aspects of Florida Municipal Bond Financing, 6 U.Fla. L.Rev. 287 (1953). Due to the excesses of the carpetbag government during Reconstruction (1865 to 1876), the state constitution was amended to limit the legislature's power to issue bonds only for the purposes of repelling invasion or suppressing insurrection. Art. IX, § 6, Fla. Const. (1885). This Court characterized the constitutional restriction as necessary to "`prevent the profligate increase of the public burden'" and to "`prevent the depreciation of our credit.'" In re Advisory Opinion to the Governor, 94 Fla. 967, 984, 114 So. 850, 855 (1927), quoting Cheney v. Jones, 14 Fla. 587, 615 (1874).
Although the 1885 constitution restricted state bond issues, the only restriction on local governments was the article IX, section 10 provision that the "Legislature shall not authorize any county, city, borough, township or incorporated district to become a stockholder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual." The legislature, therefore, authorized many local projects and, according to two commentators, local governments "had a field day" issuing bonds. Herring and Miller, Florida Public Bond Financing  Comments on the Constitutional Aspects, 21 U. Miami L.Rev. 1, 4 (1966); Patterson, Legal Aspects of Bond Financing, at 313. Florida's land boom collapsed in the 1920s, however, followed by ever-increasing local, state, and national financial difficulties. In the 1930s Florida had the highest number of local bond defaults in the United States. Herring and Miller, Public Bond Financing. See State v. Florida State Improvement Commission, 60 So.2d 747 (Fla. 1952).
In 1930 article IX, section 6 of the constitution, which restricted the state's power to issue bonds, was amended. The amendment provided in part that
the Counties, Districts, or Municipalities of the State of Florida shall have power to issue bonds only after the same shall have been approved by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such Counties, Districts, or Municipalities shall participate.
The "outstanding purpose" of the amendment was to restrain "the spendthrift tendencies of political subdivisions to load the future with obligations to pay for things the present desires, but cannot justly pay for as they go." Leon County v. State, *253 122 Fla. 505, 514, 165 So. 666, 669 (1936). This provision limited the risk associated with bond issues to only that which real property owners chose to accept. Herring and Miller, Public Bond Financing, at 5; Patterson, Legal Aspects of Bond Financing, at 314; Alloway, Constitutional Law, 8 Miami L.Q. 158, 193 (1954). To avoid having to go to the electorate pursuant to article IX, section 10, local governments turned to issuing revenue bonds.
The constitutional prohibition against pledging public credit to private enterprise, article IX, section 10, Florida Constitution (1885) (now contained in article VII, section 10), was designed "to restrict the activities and functions of the State, county and municipality to that of government and forbid their engaging directly or indirectly in commercial enterprises for profit." Bailey v. City of Tampa, 92 Fla. 1030, 1035, 111 So. 119, 120 (1926); Brautigam v. White, 64 So.2d 781 (Fla. 1953). This prohibition is closely related to revenue bonds and to what constitutes a proper public purpose. As with other aspects of bond law, the definition of public purpose has undergone changes.
In Adams v. Housing Authority of City of Daytona Beach, 60 So.2d 663 (Fla. 1952), this Court struck down a redevelopment plan. The Court commented:
It is inconceivable that any one would seriously contend that the acquisition of real estate for the declared purposes set forth in the proposed Redevelopment Plan is for a public use or purpose. No one has ever heard of any corporation, association or individual going into any of the above mentioned businesses [retail, office, wholesale, and restricted industry] except for profit or gain. If the municipalities can be vested with any such power or authority, they can take over the entire field of private enterprise without limit so long as they can find a blighted area containing sufficient real estate.
Id. at 668-69. This statement echoed a previous pronouncement that the "financing of private enterprises by means of public funds is entirely foreign to a proper concept of our constitutional system. Experience has shown that such encroachments will lead inevitably to the ultimate destruction of the private enterprise system." State v. Town of North Miami, 59 So.2d 779, 785 (Fla. 1952). In North Miami the Court reversed an order validating certificates of indebtedness to be used to purchase land and build an aluminum manufacturing plant to be leased to a private corporation.
Shortly after Adams and North Miami, however, the Court affirmed the validation of a revenue bond issue to provide municipal off-street parking facilities, pursuant to a legislative declaration that such was a proper public or municipal purpose. Gate City Garage, Inc. v. City of Jacksonville, 66 So.2d 653 (Fla. 1953). The Court distinguished North Miami and Adams and embraced the principle that, if a project's paramount purpose is a public purpose, the project may incidentally benefit private corporations or individuals. The Court followed the paramount public purpose doctrine and "flatly refused to approve the issuance of public securities" to assist "industrial developments, housing projects, ... apartment houses, baseball stadiums and projects of such nature" if the main benefit went to private enterprise rather than to the public. State v. Jacksonville Port Authority, 204 So.2d 881, 883 (Fla. 1967). In the mid 1960s the Court also reiterated its earlier interpretation of article IX, section 10 and commented that "it is patent that the design of it was to keep the State out of private business; to insulate State funds against loans to individual corporations or associations and to withhold the State's credit from entanglement in private enterprise." Dade County Board of Public Instruction v. Michigan Mutual Liability Co., 174 So.2d 3, 5-6 (Fla. 1965).
The 1968 revision of the state constitution amended article IX, section 10 of the 1885 constitution and moved it to article VII, section 10, adding to that section paragraph (c) regarding local government revenue bonds. This Court continued to apply the paramount public purpose doctrine. E.g., Orange County Industrial Development Authority v. State, 427 So.2d 174 *254 (Fla. 1983) (reversed revenue bond issue because construction of a commercial television station does not serve a paramount public purpose); International Brotherhood of Electrical Workers, Local Union No. 177 v. Jacksonville Port Authority, 424 So.2d 753 (Fla. 1982) (affirmed revenue bond issue for constructing floating drydock that would be sold to a private shipyard on an installment contract); State v. Osceola County Industrial Development Authority, 424 So.2d 739 (Fla. 1982) (affirmed revenue bond issue for constructing a lodging facility in connection with a "tourism facility"); State v. Orange County Industrial Development Authority, 417 So.2d 959 (Fla. 1982) (affirmed revenue bond issue to construct hotel in connection with convention/civic center); State v. Leon County, 410 So.2d 1346 (Fla. 1982) (affirmed revenue bond issue to construct convention center hotel); State v. Volusia County Industrial Development Authority, 400 So.2d 1222 (Fla. 1981) (affirmed revenue bond issue to acquire and expand nursing home which would then be sold to a private company); State v. City of Miami, 379 So.2d 651 (Fla. 1980) (affirmed revenue bond issue for construction of convention center/parking garage); Wald v. Sarasota County Health Facilities Authority, 360 So.2d 763 (Fla. 1978) (affirmed revenue bond issue for constructing improvements to a private hospital); Nohrr v. Brevard County Educational Facilities Authority, 247 So.2d 304 (Fla. 1971) (approved in principle revenue bond issue to construct a cafeteria/dormitory at Florida Institute of Technology), receded from on other grounds, Wilson v. Palm Beach County Housing Authority, 503 So.2d 893 (Fla. 1987). Some of the projects approved in the preceding cases illustrate a fundamental change from cases such as Adams and North Miami on allowing local governments to become involved with and compete with private enterprise. The idea of "public purpose" has indeed been broadened.
Although the paramount public purpose test was used after the 1968 adoption of article VII, section 10(c), this Court commented that the impact of that provision "was to recognize constitutionally that the public interest was served by facilitating private economic development." Linscott v. Orange County Industrial Development Authority, 443 So.2d 97, 100 (Fla. 1983) (affirming revenue bond issue to construct regional headquarters for multistate insurance company). Linscott also concluded that, with the adoption of the 1968 constitution, the paramount public purpose test had lost much of its viability. 443 So.2d at 101.
The 1968 revision of the constitution also made substantial changes in the status and authority of municipalities. Article VIII, section 2(b), dealing with municipal powers, provides, in part: "Municipalities shall have governmental, corporate and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services, and may exercise any power for municipal purposes except as otherwise provided by law." The clear purpose of this provision is to give municipalities the inherent power to meet municipal needs. Lake Worth Utilities Authority v. City of Lake Worth, 468 So.2d 215 (Fla. 1985).
As a grant of power, section 2(b) represents a fundamental change from the former constitutional provision concerning municipalities. Article VIII, section 8 of the 1885 constitution provided, in part: "The Legislature shall have power to establish, and to abolish, municipalities to provide for their government, to prescribe their jurisdiction and powers, and to alter or amend the same at any time." Under the former constitution the legislature had plenary power over municipalities. E.g., State v. City of Boca Raton, 172 So.2d 230 (Fla. 1965). Section 166.021, Florida Statutes (1985), now provides in pertinent part:
(1) As provided in s. 2(b), Art. VIII of the State Constitution, municipalities shall have the governmental, corporate, and proprietary powers to enable them to conduct municipal government, perform municipal functions, and render municipal services, and may exercise any power for municipal purposes, except when expressly prohibited by law.

*255 (2) "Municipal purpose" means any activity or power which may be exercised by the state or its political subdivisions.
... .
(4) The provisions of this section shall be so construed as to secure for municipalities the broad exercise of home rule powers granted by the constitution. It is the further intent of the Legislature to extend to municipalities the exercise of powers for municipal governmental, corporate, or proprietary purposes not expressly prohibited by the constitution, general or special law, or county charter and to remove any limitations, judicially imposed or otherwise, on the exercise of home rule powers other than those so expressly prohibited. However, nothing in this act shall be construed to permit any changes in a special law or municipal charter which affect the exercise of extraterritorial powers or which affect an area which includes lands within and without a municipality or any changes in a special law or municipal charter which affect the creation or existence of a municipality, the terms of elected officers and the manner of their election, the distribution of powers among elected officers, matters prescribed by the charter relating to appointive boards, any change in the form of government, or any rights of municipal employees, without approval by referendum of the electors as provided in s. 166.031. Any other limitation of power upon any municipality contained in any municipal charter enacted or adopted prior to July 1, 1973, is hereby nullified and repealed.
While chapter 169, Florida Statutes, formerly set out in considerable detail the powers of municipalities in regards to borrowing money, municipal borrowing currently rates only a scant page in the statutes. §§ 166.101-166.141, Fla. Stat. (1985). Now, municipalities may "issue bonds as defined in s. 166.101 ... to finance the undertaking of any capital or other project for the purposes permitted by the State Constitution... ." § 166.111. Revenue bonds issued under chapter 166 are defined as "obligations of the municipality which are payable from revenues derived from sources other than ad valorem taxes on real or tangible personal property and which do not pledge the property, credit, or general tax revenue of the municipality." § 166.101(4).
In State v. City of Sunrise, this Court analyzed the effect of article VIII, section 2, upon the authority of municipalities to issue bonds. The case involved the propriety of a municipal issue of "double advance refunding" bonds. The proceeds of the bonds were to be used in part to refinance and refund money borrowed under bonds issued in 1973. The proceeds in the 1973 bond issue had been used to advance refund bonds issued in 1970. The balance of the proceeds of the new issue was to be spent for the expansion of the city's water, gas, and sewer systems. In approving the bonds, the Court said:
Since there is no specific section in the Constitution authorizing municipalities to issue refunding revenue bonds, the Attorney General and all other parties have argued on rehearing that the municipalities may issue such bonds under their constitutional home-rule powers. Article VIII, Section 2, Florida Constitution, expressly grants to every municipality in this state authority to conduct municipal government, perform municipal functions, and render municipal services. The only limitation on that power is that it must be exercised for a valid "municipal purpose." It would follow that municipalities are not dependent upon the Legislature for further authorization. Legislative statutes are relevant only to determine limitations of authority. Since there is no constitutional or statutory limitation on the right of municipalities to issue refunding revenue bonds not payable by ad valorem taxes, we hold that municipalities may issue "double advance refunding bonds" so long as such bonds are pursuant to the exercise of a valid municipal purpose.
354 So.2d at 1209 (footnote omitted).
In view of the broad grant of constitutional authority, we approve the proposed bond issue by Panama City Beach. These bonds qualify as revenue bonds because *256 they are not payable from the ad valorem taxes and do not pledge "the property, credit or general tax revenue of the municipality." § 166.101(4). By virtue of this bond issue, the city will obtain money which will be used only for valid municipal purposes. We know of no prohibition of the city's use of arbitrage financing to acquire the funds. While we share the dissent's misgivings over a $300,000,000 bond issue which is calculated to derive only $1,500,000, the function of this Court is not to decide whether the proposed financing is wise or even fiscally sound. State v. City of Sunrise.
While not necessary to our decision, we note that subsequent to the validation of the bonds by the court below, the legislature enacted section 159.821  159.8291, known as "The Taxable Bond Act." Section 159.825, Florida Statutes (1987), now specifically authorizes the form of bonds sought to be issued by Panama City Beach. In addition, section 159.827(2), Florida Statutes (1987), provides:
(2) When the governing body of the governmental unit issuing the bonds finds and determines that the issuance of the bonds serves a public purpose, the issuance of the bonds shall be deemed to be for a paramount public purpose and the investment of bond proceeds, moneys from which such bonds are payable, and moneys pledged as security therefor in securities and obligations of any corporation, association, partnership, or person shall be deemed to be merely incidental to the paramount public purpose of the borrowing.
The state makes an additional argument that since the bulk of the proceeds of the bonds is to be invested and used to repay the bonds over a period of years, these proceeds constitute "surplus funds" within the meaning of section 166.261(4), Florida Statutes (1985). If so, the investment of the proceeds as contemplated by the bond issue would violate section 166.261, Florida Statutes (1985), which proscribes and limits the manner in which surplus public funds of a city may be invested. We reject this contention because section 166.261(4) defines surplus funds as those "held or controlled by the governing body of the municipality... ." Under the provisions of the trust indenture to be entered into between the city and a corporate trustee, the city will be required to deliver the proceeds of the bonds to the trustee, who shall become the custodian of such proceeds. The trustee is to apply such money to the purchase of the investment agreement. The trust indenture is intended to remove control of the bond proceeds from the city and vest such control in a fiduciary for the beneficial interest of the bondholders. Under these circumstances, it cannot be fairly said that the proceeds of the bonds are either "held or controlled" by the city so as to come within the definition of surplus public funds. We further observe that section 159.825(8), Florida Statutes (1987), now specifically provides that the provisions of Florida law pertaining to the investment of surplus public funds shall not be applicable to the proceeds of bonds authorized by the Taxable Bond Act of 1987.
We approve the order of bond validation.
It is so ordered.
SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
McDONALD, C.J., dissents with an opinion, in which OVERTON and EHRLICH, JJ., concur.
McDONALD, Chief Justice, dissenting.
I would not approve these bonds because I conclude that issuing bonds to obtain a fund for investment purposes is not a permissible municipal purpose and exceeds the city's grant of authority.
Article VIII, section 2(b) of the Florida Constitution deals with municipal powers and provides, in part: "Municipalities shall have governmental, corporate and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services, and may exercise any power for municipal purposes except as otherwise provided by law." This grant of power is a fundamental change from the former constitutional *257 provision, article VIII, section 8, Florida Constitution (1885), and the clear purpose of this provision is to give municipalities the inherent power to meet municipal needs. Lake Worth Utilities Authority v. City of Lake Worth, 468 So.2d 215 (Fla. 1985).
Even though article VIII, section 2 made basic changes in municipal bond issuance, the constitutional provision "still limits municipal powers to the performance of municipal functions." City of Miami Beach v. Fleetwood Hotel, Inc., 261 So.2d 801, 803 (Fla. 1972) (emphasis in original). Moreover, municipal powers "are to be interpreted and construed in reference to the purposes of the municipality and if reasonable doubt should arise as to whether a municipality possesses a specific power, such doubt will be resolved against" such municipality. Id. I cannot see how borrowing money simply for investment is a valid municipal purpose.
Regardless of whether or not the paramount public purpose test referred to in the majority opinion should be used, "neither the state nor any of its subdivisions may expend public funds for or participate at all in a project that is not of some substantial benefit to the public." State v. Miami Beach Redevelopment Agency, 392 So.2d 875, 886 (Fla. 1980). The primary purpose of the revenue bond issues that have been validated in the past has been the construction of physical facilities that have benefited the public by, for instance, improving health care and housing and encouraging industrial growth and enhancing Florida's attractiveness to tourists.
I can see no substantial benefit to the public in the instant "investment" revenue bond issue. It appears rather that the substantial benefit, up to $300,000,000 in the proceeds of this bond issue, will go to the insurance company or other entity with which those proceeds will be invested. I see no valid public purpose in investing for investing's sake. Making a profit on an investment is an aspect of commerce more properly left to commercial banking and business entities.
The city argues that we should emphasize the uses to which the profits of this bond issue will be put, recreational facilities and a self-insurance program. Those are things the city should be concerned with. It cannot be denied, however, that the primary purpose of this bond issue is to borrow money from the bond purchasers to invest for a profit. Municipalities should not be encouraged to resort to the "easy" method of financing public projects and programs.
The city tendered, without comment, a copy of house bill 1398, adopted during the 1987 legislative session and effective August 5, 1987. This bill creates part VII of chapter 159, Florida Statutes, and provides that governmental units may issue taxable bonds. Subsection 159.821(1) states in part: "The ability of governmental units to issue bonds is essential to their ability to finance public improvements and other projects that serve important public purposes." Subsection 159.827(1) provides that the "issuance of taxable bonds by a governmental unit for any purpose permitted under the statutes under authority of which such taxable bonds are issued is declared to constitute a lawful and public purpose." Section 159.827 goes on to provide:
(2) When the governing body of the governmental unit issuing the bonds finds and determines that the issuance of the bonds serves a public purpose, the issuance of the bonds shall be deemed to be for a paramount public purpose and the investment of bond proceeds, moneys from which such bonds are payable, and moneys pledged as security therefor in securities and obligations of any corporation, association, partnership, or person shall be deemed to be merely incidental to the paramount public purpose of the borrowing.
Because neither side had addressed this new legislation, we ordered supplemental briefs explaining the new law and its impact on governmental bonds. Both the city and the state agree that the act authorizes the issuance of taxable bonds for public purposes and that the act appears to authorize the issuance of arbitrage bonds. According to the city, therefore, this new *258 legislation lays to rest all questions regarding the propriety of the proposed bond issue. The state, on the other hand, argues that the instant proposal is invalid under the new law.
The act recognizes that a taxable bond issue must be for a public purpose and declares issuing such bonds for a permitted purpose to be a lawful and public purpose. § 159.827(1), Fla. Stat. (1987). In general, a legislative declaration of public purpose will be deemed correct unless clearly erroneous and beyond the legislature's power. State v. Housing Finance Authority, 376 So.2d 1158 (Fla. 1979). Here, however, the public purpose has been stood on its head, so to speak. Rather than the financing agreement being incidental to a public purpose (section 159.827(2)), the public purpose is incidental to the financing agreement. As stated previously, borrowing solely to invest is not, and never has been, a proper public purpose; I do not read the new statute to say that it is. Again, we should hold that floating the instant bond issue for the primary purpose of gaining funds to invest, even though the anticipated profits will be used for valid public purposes, is not a proper public purpose.
OVERTON and EHRLICH, JJ., concur.