186 So.2d 6 (1966)
Paul L. BRANDES et al., Appellants,
v.
CITY OF DEERFIELD BEACH, Appellee.
No. 34873.
Supreme Court of Florida.
April 18, 1966.
Rehearing Denied May 23, 1966.
*7 Delford P. Richey, Pompano Beach, for appellants.
Robert T. Carlile, Deerfield Beach, for appellee.
BARNS, PAUL D., Justice
This is a taxpayers' appeal from a final decree validating the proposed issuance of municipal bonds secured by pledge of certain tax revenues by the City of Deerfield Beach. We reverse.
The City, of a population of approximately 15,000 inhabitants, proposes issuance of $1,500,000 Excise Tax Improvement Bonds maturing over a period of 30 years, requiring an annual debt service of approximately $86,000.00. The Resolution authorizing the issuance of these bonds pledges as security for their payment its revenue derived from (1) "Cigarette Taxes", (2) "Franchise Taxes" from Florida Power & Light Co. and Southern Bell Telephone & Telegraph Company, (3) "Occupational License Taxes" and, (4) "Alcoholic Beverage Taxes".
On August 19, 1965, (the same day of the passage of a Resolution authorizing the issuance of the above mentioned bonds of $1,500,000.00) the City signed a lease with Deerstad, Inc., a corporation, reciting that Deerstad held an option to purchase a designated 40 acre tract of land which Deerstad would assign to the City and in turn the City would exercise the option and purchase the land and lease it to Deerstad and the City would construct thereon various buildings and structures and would furnish certain equipment, facilities and furnishings needed and required of Deerstad by its sub-lessee, the Pittsburg Athletic Company, Inc., a corporation (owner of the "Pittsburg Pirates" baseball team.).
The purpose of the bond issue is to obtain funds with which to acquire a parcel of land and to construct thereon facilities to be used as spring training headquarters for the Pittsburg Pirates, a major league *8 baseball team. One hundred forty thousand dollars ($140,000.00) of the proceeds will be placed in escrow to secure the payment of a prior bond issue to which the Cigarette Taxes of the City are presently pledged. It is necessary to secure the payment of the prior bonds in order that the Cigarette Taxes may be pledged to the payment of the $1,500,000.00 bond issue. The $1,360,000.00 balance of the proceeds will be used to acquire land and to construct spring training quarters for the Pirates. Once completed, the facility will be effectively leased to Deerstad; that corporation will, in turn, effectively lease the project to the Pirates.
The Lease Contract between the City and Deerstad (hereinafter referred to as "lease") provides that upon default or termination of the lease for any reason, the City may take over the obligations of Deerstad to the Pirates as follows:
"Upon default in this Lease Contract by CORPORATION, or upon expiration of the term or termination hereof, CITY or any person or party acting under CITY shall be entitled to all the rights and shall assume and discharge all the obligations of CORPORATION under the said Agreement and Lease between CORPORATION and Pittsburgh Athletic Company, Inc. with the same effect as if said Agreement and Lease had been executed by CITY or such other person or party rather than CORPORATION and as if the name of CITY or such other person or party had been set forth therein in each place where the name of CORPORATION appears. Without limiting the generality of the foregoing, CITY or such other person or party, as the case may be, shall be entitled to receive and collect all rentals and other amounts payable by Pittsburgh Athletic Company, Inc. under said Agreement and Lease and to exercise the remedies provided therein on the occurrence and continuance of any default by Pittsburgh Athletic Company, Inc."
These obligations are fixed by an Agreement and Lease between Deerstad and the Pirates (hereinafter referred to as "sublease").
The facilities to be provided by the City, as stated in the Bond Resolution, are as follows:
"* * * [I]mprovements in said City consisting of, but not limited to, a municipal stadium seating approximately five thousand people, together with other facilities related thereto, including, but not limited to, baseball fields, dormitory and dining facilities, parking areas, outdoor lighting facilities, and the acquisition of land in connection therewith, together with other purposes necessary, incidental or appurtenant thereto, all substantially in accordance with the plans and specifications to be approved by this Commission, * * *."
Exhibit A attached to the Lease sets out the details as to what the City will be required to furnish. Among other things, the City must furnish a stadium, four additional baseball fields, four movable batting cages, a sliding pit, running track, lighting for all fields, field maintenance house with observation tower, clubhouse, housing for 274 people (including furniture, bedding, etc.), dining room for 180 people, kitchen for 220 people (including utensils, dinnerware, silverware, and glassware), and parking facilities. All of the facilities are to be as agreed upon by the City and the Pirates. Should the Lease terminate, the City may be substituted for Deerstad in the sublease.
In operation of the project, it is estimated that the City must pay yearly the sum of $58,000.00 for all maintenance, including painting, plumbing and other major and minor repairs; all utilities, "including without limitation, water, electricity, gas, heat, garbage disposal and sewage", (except telephone and telegraph) furnished by the City; maintenance of the playing fields and related areas, including the concession *9 areas. Should the City for its protection be required to take over the obligations of Deerstad to the Pirates under the sublease, the City would then be obligated to "provide, pay and be responsible for all necessary ticket sellers, ticket takers, ushers, police, public address announcers, parking lot attendants and other necessary personnel [and] all necessary personnel to operate the concession stands, parking areas and all other activities * * *" and Deerstad's obligation to sell $18,000.00 in preseason tickets.
The term of the Lease between the City and Deerstad is five (5) years, with the City being obligated to proceed under Section 132 of its Charter to offer the property for a thirty-year lease. In such an offering, the City must require all bidders to agree to assume Deerstad's obligations under the sublease, must require capitalization of the bidder at least equal to that of Deerstad, and must offer the property at the same minimum terms as the present five-year lease.
As rental on this project, Deerstad is to pay an amount equal to the debt service on the $1,360,000.00 in bonds attributable to the project and fifty percent of the net profits in excess of prior years' losses. Deerstad will receive all rentals on the project and all concessions and other income-producing rights, except those reserved by the Pirates. In return for this rental, the City must acquire the land, construct the facility, furnish the equipment, maintain the project, provide free municipal occupational licenses and pay all ad valorem taxes, if any, and insure the project against casualty losses. Should Deerstad fail, the City would have to pay off the bonds, of course, and may take over Deerstad's rights and obligations to the Pirates in the protection of the City's interest.
The services to be rendered by the City (estimated annual cost of $58,000.00) is provided for in the City's lease to Deerstad as follows:

"7. MAINTENANCE AND SERVICES BY CITY: City shall provide, pay and be responsible for field maintenance, parking area maintenance and building maintenance. Without limiting the generality of the foregoing, CITY shall pay all utilities, including without limitation, water, electricity, gas, heat, garbage disposal and sewage (but excluding telephone and telegraph). CITY shall maintain and keep in good repair and sound operating condition the Premises and Personal Property and make necessary renewals and replacements therefor, extraordinary as well as ordinary, including painting, plumbing and other major and minor repairs and shall provide the necessary personnel therefore. CITY shall furnish and pay for the cost of grounds-keeping personnel, field repairs, clay, fertilizer, top dressing, truck maintenance and other items necessary to maintain the baseball playing fields and related areas on the Premises and to keep them in good condition. CITY shall clean up the playing fields, grandstands, parking areas and other facilities on the Premises after each exhibition baseball game and as otherwise required to maintain the Premises in clean and orderly condition. CITY shall be responsible for maintaining the concession areas in clean and sanitary condition and free of refuse and debris.
"In addition, CITY shall furnish adequate police protection during all games or exhibitions for which a charge is made to the public for attendance."

CITY IN PRIVITY WITH PIRATES  THIRD-PARTY BENEFICIARY
The City and the owners of the Pirates are in privity of contract with each other as to the Lease from Deerstad to the Pirates. The Lease of the City to Deerstad provides:
"21. APPROVAL OF SUBLEASES OF CORPORATION: It is understood and agreed that the essence of this *10 Lease Contract is that the Pittsburgh Athletic Company, Inc., is in turn leasing the Premises and Personal Property from CORPORATION for use by its major league baseball club, the Pittsburgh Pirates, and its various minor league baseball clubs for spring training purposes and for certain other purposes. CORPORATION contemporaneously herewith has entered into an Agreement and Lease with Pittsburgh Athletic Company, Inc. providing for the lease of the Premises and Personal Property for a certain term to Pittsburgh Athletic Company, Inc. for such spring training purposes and for certain other purposes during each year of the term thereof. Such Agreement and Lease between CORPORATION and Pittsburgh Athletic Company, Inc., is attached hereto as Exhibit B and CITY does hereby consent to and approve such Agreement and Lease and agrees to be bound by the terms and conditions thereof where applicable.
"It is also understood and agreed that CORPORATION is presently attempting to secure a Florida State League franchise to operate a professional baseball club in such league in the City of Deerfield Beach. If CORPORATION is successful in obtaining such a franchise, it shall have the right to use the Premises and Personal Property for the operation thereof.
"Except as provided in the Agreement and Lease between CORPORATION and Pittsburgh Athletic Company, Inc. attached hereto as Exhibit B, and except for any arrangements which may be necessary for the operation of a Florida State League franchise on the Premises, CORPORATION may not sublet the Premises or Personal Property or any part thereof for any period of time in excess of 90 days, nor beyond a period of 90 days from the date of the sublease agreement, without first requesting in writing and obtaining the written consent of CITY, which consent shall not be unreasonably withheld. No such sublease shall release CORPORATION from any of the duties or obligations to CITY contained herein without obtaining the express written consent of CITY with respect thereto."
The City's initial lease to Deerstad is to be for a term of five years, which is permitted without competitive bids, but the City is prohibited by Section 132 of its Charter to "lease or grant concessions to private persons, firms or corporations for non-public purposes for a period of not more than fifty (50) years, any lands, improvements, public buildings, recreational parks or facilities", except on "competitive conditions for lease as desired" after public notice and subject to the proposed long-term lease of more than five years being disapproved upon a Referendum Election, provided for by Section 132, supra, as follows:
"* * * Upon the Commission approving any proposal submitted as provided herein, said proposal shall be accepted by resolution duly adopted, authorizing the preparation of the lease, provided a valid referendum petition has not been filed. If before the day advertised for receiving bids for lease of such property, a referendum petition is filed with the Clerk signed by fifteen percent (15%) of the electors of the City, demanding a Referendum Election upon the question of leasing such property, no lease shall be executed by the City until after approval by a majority of the voters participating in such Referendum Election. Such Referendum Election shall be called and held as provided in this Charter."
The City's five-year lease to Deerstad further provided that the City would offer for competitive bid a thirty-year lease of the leased premises and personal property, upon the same terms and conditions of the five-year lease, "immediately upon the validation of the Bond Issue and sale of the Bonds", which lease specifically recognized *11 the Pirates as a third-party beneficiary. The City's five-year lease to Deerstad provides:
"22. EXTENSION OF TERM OF LEASE AND BIDDING THEREON: It is understood and agreed that, while the term of this Lease Contract is for a five year period, it is such because CITY is not in a position to lease for a longer period without compliance with Section 132 et seq of CITY'S Charter. It is further understood and agreed by and between the parties that, immediately upon the validation of the Bond Issue and sale of the Bonds, as provided herein, CITY will, by compliance with Section 132 et seq of the provisions of CITY'S Charter, offer the herein described Premises and Personal Property for a leasehold term of 30 years, or the then remaining retirement period for the Bond Issue being utilized to construct, provide and furnish the Premises and Personal Property herein described, upon the same terms and conditions as herein set forth, leaving open to bid only the sum of money to be paid CITY as rental for said Premises and Personal Property. It is further understood and agreed that in reliance on and by reason of the obligations of CITY hereunder, Pittsburgh Athletic Company, Inc. and CORPORATION have mutually entered into a certain Agreement and Lease attached hereto as Exhibit B. Pittsburgh Athletic Company, Inc., is hereby deemed a third party beneficiary to this Lease Contract and CITY shall require that all bidders for such leasehold must assume the obligations of CORPORATION under its said Agreement and Lease with Pittsburgh Athletic Company, Inc., and shall succeed to the rights of CORPORATION thereunder. CITY shall further require that all bidders must have a capitalization equal to CORPORATION'S, and shall, in its bid requirements, make the terms of this Lease Contract the minimum biddable terms. "CORPORATION shall bid for the said leasehold upon the same terms and conditions as herein contained, or greater if it so desires, and CITY is hereby instructed that CORPORATION does hereby irrevocably enter its bid on the terms and conditions herein set forth. In the event CORPORATION is successful in its bid, then the terms of this Lease Contract shall be rewritten to be a lease for a term of 30 years, or as above stated for the term of the bonded indebtedness. In the event that CORPORATION is not successful in its bid, and a different bidder obtains the Premises and Personal Property, then, in such event, this Lease Contract shall be deemed canceled." (Emphasis supplied.)
The Lease from the City to Deerstad in recognition that the Pirates are in privity of contract with the City provides that in the event of default by Deerstad to pay its rent ("default in its obligations") to the City, then the City may notify the Pirates of such default and that if the Pirates pay to the City its rent due to Deerstad, such payments shall discharge the Pirates' obligations to Deerstad; and, in event of the termination of the City's Lease to Deerstad, the Pirates sublease "shall continue and remain in full force and effect until the expiration of the term thereof or earlier termination thereof in accordance with the provisions therein." The obligations of Deerstad to the City are not assumed by the Pirates in Deerstad's sublease to the Pirates, but the Pirates are a third-party beneficiary to the lease to Deerstad.
Article IX, Section 5, of the Constitution, provides that "The Legislature shall authorize * * * incorporated cities * * * to assess and improve taxes * * * for municipal purposes, and for no other purposes. * * *"; and Article IX, Section 10, of the Constitution prescribes that "The Legislature shall not authorize any * * * city * * * to loan its credit to any corporation, association, institution or individual."
*12 "Taxes for municipal purposes" means a public purpose as distinguished from a private or nongovernmental purpose; a purpose intended to embrace some of the functions of the governmental agency. The mere incidental advantage to the public resulting from a public aid in the promotion of private enterprise is not a public or municipal purpose; and the incidental benefits or advantages gained by private enterprise from expenditures made for a public purpose do not vitiate or diminish the public purpose.
Dade County Board of Public Instr. v. Michigan Mutual Liability Company, Fla., 174 So.2d 3, in passing on the question of whether the school board was lending its credit in violation of Section 10 of Article IX of the Constitution, F.S.A., in purchasing liability insurance in a mutual company, the court in construing Section 10 stated:
"Reading the whole section, it is patent that the design of it was to keep the State out of private business; to insulate State funds against loans to individual corporations or associations and to withhold the State's [or municipal] credit from entanglement in private enterprise."
It seems clear that purpose of the proposed bond issue is not for a public purpose or municipal purpose, and furthermore that the City, by the proposed services to be rendered by it, is lending its credit in contravention to the provisions of Sections 5 and 10, Article IX of the Constitution. City of Daytona Beach v. King, 132 Fla. 273, 181 So. 1; State v. Town of North Miami, Fla., 59 So.2d 779; and, City of Clearwater v. Caldwell, Fla., 75 So.2d 765.
The power of a municipality to levy taxes is founded on the right, duty and responsibility to maintain and administer all the functions of the municipality having a public municipal purpose; and such taxing power may not be used or pledged to the end that trade may be accelerated by an experiment in practical economics through a particular private enterprise of a nongovernmental nature.
The decree validating the bonds appealed from is 
Reversed.
THOMAS, O'CONNELL and CALDWELL, JJ., concur.
THORNAL, C.J., dissents with opinion.
ROBERTS and ERVIN, JJ., dissent and concur with THORNAL, C.J.
THORNAL, Chief Justice (dissenting).
I am deeply concerned that the Court has today drawn too tight a line around public financing for the accomplishment of legitimate public objectives. It is my view that the impact of the majority decision will have far-reaching adverse results upon Florida's admitted ambitions to develop its recreational facilities as essential aspects of our vital tourist industry.
Admittedly, the provision of extensive recreational facilities is a recognized public purpose in a state which has devoted a substantial segment of its economy to the attraction of visitors, thousands of whom ultimately become permanent residents. Given the public purpose, I can find no objection to a cooperative program in which a governmental agency and a private entity collaborate to accomplish the legitimate public objective. The Florida Development Commission tells us that there are presently 16 Major League baseball teams which train in our state in the spring of the year. There are 79 minor league teams which also train in Florida. The same source advises that baseball has become an estimated twenty-five million dollar a year business. Undoubtedly, many, if not all, of these baseball organizations lease and occupy publicly-owned facilities in substantially *13 the same fashion as Deerfield Beach proposes for the accommodation of the Pittsburg Pirates. It appears to me that the City here proposes to accomplish nothing more than we have repeatedly approved in similar financing plans over the years.
In State v. City of Miami, Fla., 41 So.2d 545, we approved Miami's issuance of revenue certificates to finance additional seats for the Orange Bowl Stadium, which is now recognized as one of the major sports facilities of the country. In State v. Daytona Beach Racing and Recreational Facilities District, Fla., 89 So.2d 34, we authorized a public district to issue securities to construct a speedway, which would be leased to a private enterprise for a period of months each year for 40 years. In Sunny Isles Fishing Pier v. Dade County, Fla., 79 So.2d 667, we permitted the leasing of a publicly-owned fishing pier to a private enterprise for development by private capital. In related activities we have repeatedly recognized the issuance of public securities to construct publicly-owned facilities which were needed to accommodate private enterprises engaged in serving a public function. In Seaboard Airline R. Co. v. Peters, 43 So.2d 448, this Court actually approved the issuance of so-called revenue certificates which pledged a 2 mill ad valorem tax to expand the Miami International Airport for the accommodation of privately-owned airlines. This was done without benefit of freeholder approval. Again in State v. Dade County, 62 So.2d 404, the Court approved the issuance of public securities to construct a large warehouse and overhaul shop on public land for immediate rental to a privately-owned airline. These decisions are merely illustrative of many others which could be cited.
I simply feel that the cited decisions should be followed in this instance to enable the appellee City of Deerfield Beach to effectuate a program which its municipal officials have concluded would redound to the welfare of the community and its citizens. If they are no longer the law we ought to say so. I think they are sound and should control here.
Despite my profound respect for the views of my colleagues of the majority, I am compelled to dissent. I would affirm the decree of the trial judge and validate the proposed revenue certificates.
ROBERTS and ERVIN, JJ., concur.