193 So.2d 162 (1966)
The STATE of Florida et al., Appellant,
v.
MANATEE COUNTY PORT AUTHORITY, Appellee.
No. 35386.
Supreme Court of Florida.
December 14, 1966.
Rehearing Denied January 23, 1967.
Paul Antinori, Jr., Tampa, and John Burton, for appellant.
Richard A. Hampton, of Goodrich, Hampton & Boylston, Bradenton, for appellee.
THOMAS, Justice.
This appeal brings to us the decree of the Circuit Court of Manatee County, dated 2 May 1966, validating Manatee County Port Authority Revenue Bonds in the amount of 18.5 million dollars proposed to be issued to construct port facilities at a place called Piney Point.
The petition to validate the bonds was filed by the Board of County Commissioners of Manatee County in their capacity as Manatee County Port Authority.
An exhaustive presentation is made here of the source of revenue for the retirement of the bonds, the anticipated commerce which would be drawn to the port, the equipment required to operate the facility, the effect of the installation upon the Port of Tampa, the convenience of the loading facilities and their accessibility to the phosphate fields in the Lakeland-Bartow area *163 and, generally, on the advantages to the immediate territory and the disadvantages to the Port of Tampa, away from which the business would be drained.
It is proposed to acquire 570 acres of land, 327.5 acres of which would be immediately devoted to development of facilities for loading phosphate on ocean going ships and a sizeable part of the proceeds from the bonds would be used to construct a 14,000 foot channel, 400 feet in width and 35 feet in depth, with a turning basin connecting the installation with the present channel in Tampa Bay, so that phosphate could be transferred by ships to the open sea.
The record indicates that 60 per cent of the land to be acquired and 98 per cent of the land improved will be devoted to the phosphate facility. A relatively small area adjacent to the space assigned to load ships with phosphate would be useable for the handling of general cargo.
It appears from the record that a phosphate loading elevator with incidental trackage sheds and storage facilities costing at least $12,500,000 would occupy the 327.5 acres of the development to which we have alluded. A slip is intended to be constructed next to the elevator especially designed to load phosphate.
The pivotal and vital feature in this litigation is the lease to the railroads, Atlantic Coast Line and Seaboard Airline, which has already been executed, granting what appears to be exclusive use of the phosphate loading facilities for 40 years, with privilege of renewal for a like period. For use of the property the railroads are to pay $749,440 yearly, plus maintenance costs of the facility and a substantial amount of the expenditures for the upkeep of the channel.
Many questions have emerged from the voluminous record consisting of 216 pages of pleadings, 316 pages of testimony and 710 pages of exhibits and are presented in seven briefs, totaling 231 pages, and the questions posed are many and varied. For instance, the validity of Chapter 315, Florida Statutes, F.S.A., is challenged; the ruling of the trial court on the failure of Manatee County Port Authority to get approval of Hillsborough County and Tampa Port Authority for construction of the improvement is questioned; the pledge of race track funds to payment of the bonds is criticized, and so on.
Despite the interest of counsel who have diligently and, we may say, expertly presented them, we think the primary question determinative of this litigation is whether or not the proposed issue and the operation in respect of it offends against Section 10 of Article IX of the Constitution, F.S.A. If it does, then discussion of the ancillary questions would become merely academic. Further, to bring the problem into clearer focus, we must go a bit further with the factual background to determine just how much of the proposed improvement is to redound to private enterprise in proportion to the amount available for public use.
It appears that the improvement, except the relatively small space for the accomodation of general cargo, is designed for the handling of phosphate and phosphate products to be delivered to the dock by two railroads, the Atlantic Coast Line and the Seaboard Air Line. Not only is such a plan obvious, but the Port Authority has already, on 1 November 1965, entered into a lease to the two railroad companies reciting that it had been determined that a need existed "for the establishment and development of public port facilities in the County of Manatee, Florida, and the Manatee County Port Authority [had] been [theretofore] duly created pursuant to Chapter 315, Florida Statutes [F.S.A.], in order to accomplish said public purposes * * *." (Italics supplied.)
Under the lease the Port Authority is committed to construct detailed improvements at an estimated cost of $12,440,669, to facilitate the receipt and delivery into *164 vessels of phosphate rock and other phosphate based products, and in the event the operation for such purposes shall prove economically unfeasible, then the lessees (the railroad companies) are privileged to use the property for the handling of any other commodities not then being handled by other "existing facilities at the * * * Port."
From its inception, this arrangement appears to be one to use public funds to assist and enhance private enterprise. As we interpret the lease, it is a grant to the railroads of exclusive use of the facilities at public cost. This thought is emphasized by certain provisions with reference to supervision by the lessees of even preliminary steps in the financing as well as eventual construction of the facility. For example, it is provided in the lease that if the lessees shall "in good faith fail to approve of any proposed sale of such Bonds, either the Port Authority or the Lessees may cancel this lease and both * * * shall be released from all claims for damages resulting directly or indirectly from such cancellation." Furthermore, it is stipulated that the "Lessees shall have the right to approve the terms of the sale of the Bonds * * * to finance the construction costs of the Leased Premises" and if they fail in good faith to give their approval they may cancel the lease and be released of all damages flowing from the cancellation. And finally the lessees are given the right to audit the records of the Authority "concerning all elements of the Construction Costs * * *."
The plan is given color of public interest by provision for dockage space for general cargo. But that is not enough to stamp it a genuine improvement for a public purpose since the space is relatively inconsequential and can be said only to be incidental to the main object.
We thought and hoped that we had laid down a specific exception to the rule that public funds may not be spent for private purposes. This rule was announced as early as 1933 in the case of Brumby v. City of Clearwater, 108 Fla. 633, 149 So. 203. In the intervening years, the exception has been recognized. We have repeatedly held that use of part of the proceeds of such bonds for incidental private operations will not vitiate the entire issue, but we have reiterated the restriction that diversion of any part of the funds will not be tolerated unless the expenditure is purely incidental to the main project. Such were the effects of the decisions in Adams v. Housing Authority of City of Daytona Beach, Fla., 60 So.2d 663; Gate City Garage, Inc. v. City of Jacksonville, Fla., 66 So.2d 653; Panama City v. State, Fla., 93 So.2d 608; State v. Clay County Development Authority, Fla., 140 So.2d 576, and in the later case of State v. Washington County Development Authority, Fla., 178 So.2d 573, and in the recent case of Brandes v. City of Deerfield Beach, Fla., 186 So.2d 6.
In most, if not all, of these cases, the plea has been made that the proposed project would be of great benefit to the area affected. In the present case the converse is presented with great emphasis on behalf of the City of Tampa which, it is argued, would become a "second rate" port if the contemplated project materialized. But neither the advantage to one community nor the disadvantage to another is the criterion by which this Court should judge the merits of a given project. The guiding star is the Constitution itself and the interpretation conscientiously given it by this Court.
Upon earnest reflection we apprehend that had a contrary decision been given in the cases adopting the rule and limiting it by the exception, financing by public funds would have gotten completely out of hand.
Inasmuch as the proper use of the funds is vital, and we have been impelled to the view the proposed plan fails this test, we will not, as we observed in the beginning, indulge in a discussion of the many points *165 raised that lose their force and significance in this situation.
The decree validating the bonds is reversed.
DREW, O'CONNELL and CALDWELL, JJ., concur.
THORNAL, C.J., agrees to conclusion.
ROBERTS, J., dissents with opinion.
ERVIN, J., dissents.
ROBERTS, Justice (dissenting).
I dissent and would affirm the judgment validating the bonds.