210 So.2d 200 (1968)
STATE of Florida et al., Appellants,
v.
COUNTY OF DADE, Florida, by Its Board of County Commissioners Acting As Dade County Port Authority, Appellee.
No. 36867.
Supreme Court of Florida.
May 8, 1968.
Rehearing Denied June 6, 1968.
*201 Richard E. Gerstein, State Atty., and Charles D. Edelstein, Asst. State Atty., for the State.
Paul & Sams, Miami, for Dan Paul.
Thomas C. Britton, Stuart Simon, Miami, Mitchell, Petty & Shetterly, New York City, for appellee.
ADAMS, Justice.
This is an appeal from a decree validating revenue certificates.
Phenomenal growth of the Miami International Airport required considerable further expansion and in 1967 the County of Dade, acting through the Dade County Port Authority, which will hereafter be referred to as the "Authority," entered into what might be termed a revised agreement with National Airlines, hereafter referred to as "National." The sum and substance of the revised agreement is for the Authority to lease to National for a period of thirty (30) years about seventy-five (75) acres of land of the airport for a ground rent of something more than $350 per acre as an annual rent and in addition, National is to pay a rental on the improvements to be erected thereon sufficient to retire revenue producng bonds of $34,640,000 over the thirty (30) year period. This is in fact a conventional lease agreement designed to finance buildings on the leased area to accommodate National's expansion, which in turn also contributes primarily to the continued development of Miami International Airport. This lease covers a relatively small part of the entire airport.
The lease is necessarily lengthy and it must of necessity be comprehensive. We are, however, not concerned and it's not our function to override the business judgment of the contracting parties (see Town of Medley v. State, 162 So.2d 257, Fla. 1964). We have, however, examined it to the point of ascertaining that on the whole it is an agreement entered at arm's length for the mutual advantage of the two contracting parties and the whole undertaking is for a public purpose. The rental payments are necessarily scheduled to enable the Authority to issue revenue bonds in such fashion as to render them acceptable to the money market.
The State, through the State's Attorney and the interested taxpayer, the Honorable Dan Paul, has challenged the decree of validation in that it violates Section 10, Article IX, of the Florida Constitution, F.S.A., which reads as follows:
"Section 10. Credit of state not to be pledged or loaned.  The credit of the State shall not be pledged or loaned to any individual, company, corporation or association; nor shall the State become a joint owner or stock-holder (sic) in any company, association or corporation. The Legislature shall not authorize any county, city, borough, township or incorporated district to become a stock holder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any *202 corporation, association, institution or individual."
Frankly we do not feel that this is an open question. This Court has consistently gone along with the Authority as appears from our opinions cited herein. National, as in the previous cases, is not just a private corporation which might be classified as a newcomer. It has demonstrated its experience and it likewise is a public service corporation engaged in serving the public in a great transportation system. To reverse our field now and strike down this decree would be difficult to understand in the light of our previous holdings in this very situation. We are still convinced that this overall project of the Dade County Airport is a public project. To now hold that we were wrong and invalidate this decree would naturally perplex thoughtful and concerned people as well as create great consternation. The tremendous growth of this airport lends support to our position rather than demonstrates error.
The interested taxpayer in the proceedings before the Chancellor indulged the hypothesis that our decision in the case of State of Florida v. Jacksonville Port Authority, 204 So.2d 881 (1967), had the effect of receding from the line of cases which we have decided on this subject. In this he is very much in error. The Jacksonville Port Authority did not persuade this Court that the functionary was sufficiently public in nature as to warrant them in approving the plan of financing. Likewise is there a distinction in State of Florida et al. v. Manatee County Port Authority, 193 So.2d 162 (Fla. 1966), from the one now before us. In the Manatee case the overall purpose was private rather than public.
It is our conclusion that we upheld the validity of this act in State of Florida et al. v. Dade County, 157 Fla. 859, 27 So.2d 283 (1946), and in the other cases which have come to us under this act from the identical airport. See also Seaboard Air Line R. Co. v. Peters, 43 So.2d 448, Fla. 1949. We have upheld validations under similar lease agreements. Therefore we see no reason to condemn this one.
We likewise distinguish this decree from our holding in State of Florida et al. v. Clay County Development Authority, 140 So.2d 576 (1962). In the latter case the Court was of the opinion that the overall purpose was private and not public because there they were dealing with a private corporation with the thought of engaging in the plastic business, a private as distinguished from a public purpose. In no sense was that a public project.
The interested taxpayer has further questioned the validity of the agreement as violative of Sections 1, 5 and 10 of Article IX and Section 16 of Article XV of the Florida Constitution. We have duly examined the whole record and we are not persuaded that these contentions have merit. We have likewise considered the other questions posed and we find that they relate to isolated and fragmentary elements in the lease agreement and when standing alone they might be offensive, but considering the broad scope of the entire lease agreement we are convinced that the facility will be built and serve as part and parcel of the public functionary, to-wit the airport. There is a complete absence of any obligation on Dade County to levy any tax to support this endeavor. It is our conclusion that this undertaking is no different in principle and character to that of the other issues which have been brought to this Court pursuant to this act and the amended acts of the Legislature.
Appellants object to the plan to construct parking facilities, a restaurant and training school. We will not condemn this project because the contracting parties concluded in their judgment all of these were essential and added to the effectiveness of the prime purpose. This falls in their area of judgment so long as we find that the expenditure for them is incidental to the prime objective.
*203 We consider an objection made by the State's Attorney to this mode of financing and we quote his brief:
"Appellee maintains that the construction of facilities at the airport are for the public benefit and that no harm can come in effect from this bond issue. The fact remains that whenever revenues are pledged for such purposes as building an employees (sic) parking garage, the revenues are not then available to be pledged for other purposes such as constructing additional landing areas or increasing the size and capacity of the terminal or any number of other projects of a direct benefit to the public. The record reflects an indication that these bonds are salable in part because they are Federally tax exempt. How long will the Federal treasury permit a tax exempt status to municipal bonds when they are being used for other than strictly municipal purposes? The affirmance of this validation runs the risk of killing the goose that laid the golden egg."
Our answer to this criticism lies in the fact that this Court is not a policy-making institution. In retrospect the machinery for this kind of undertaking stems from the policy of the Legislature by creating the authority, granting the powers and determining the purpose. It is the duty of the Court to honor the legislative act unless we are convinced beyond a reasonable doubt that it contravenes the Constitution of our State. Suffice it to say here the cited cases in this opinion show that this Court many years ago approved the validity of the enabling act. Be it remembered also that the Legislature has met many times and not only seen fit to let the act stand, but in their wisdom they have re-enacted it with suitable changes. It would be presumptuous and most improper for us to invade the prerogative of the Legislature. In spite of all the objection which is registered relative to the parking facilities, restaurant and training school, we can well understand that these can be facilities essential to more effectively carrying out the real purpose of the airport facility. Objection is made because National is to have the exclusive use and control of this facility and that they will no doubt earn profits on the same. It is quite obvious that National must make a profit to stay in business. It is a well-known fact that they are not running a great airline as an eleemosynary institution. On the other side the Authority has an obligation to avail itself of competent and dependable agencies such as National, as chosen in this case, to perform this public function for the use and benefit of the public. It would seem to follow that National must of necessity have control of the premises upon which they are paying the lease.
This is a common method used the world over to finance public improvements. There are some areas where the money is to be found and there are other areas where the know-how is to be found and one of the many functions of government is to utilize these two in promoting those functions which are so highly essential and necessary for the public and as to this project we determine again that it is a public purpose and the financing as shown here is consistent with the law of this State and in no way is it inconsistent with the Constitutions of the State of Florida or the United States.
Hence the decree is affirmed.
ROBERTS and ERVIN, JJ., concur.
THORNAL, J., agrees to conclusion with opinion.
CALDWELL, C.J., and THOMAS, J., dissent.
DREW, J., dissents with opinion.
THORNAL, Justice (concurring in conclusion):
I concur in the conclusion for reasons set out in the dissenting opinions in State *204 v. Jacksonville Port Authority, 204 So.2d 881 (Fla. 1967); State v. Washington County Development Authority, 178 So.2d 573 (Fla. 1965); Brandes v. City of Deerfield Beach, 186 So.2d 6 (Fla. 1966); State v. Clay County Development Authority, 140 So.2d 576 (Fla. 1962). These references will reveal my consistent view that revenue bonds, such as those here proposed, are not condemned by the Florida Constitution. My concern in recent years, has resulted from what appeared to me to be a deviation from this Court's own precedents. Hence, my dissent then, and now, my concurrence on the basis of those dissents. I must frankly concede that I can find no distinction between the financing program tendered here, and the one ruled out by the Majority in Jacksonville Port Authority, supra. I think they are both equally valid. The validity of the instant proposal was placed at rest fifteen years ago. State v. Dade County, 62 So.2d 404. Recent deviations from this authoritative precedent, have, in a measure, inspired the dissents to which I now advert.
In arriving at my conclusion here, I sense no disloyalty to stare decisis or judicial responsibility. Consistent judicial insistence upon the soundness of a dissenting position, is not inharmonious with the traditional fulfillment of the judicial mission. I regard it to be the duty of a judge to continue to urge his position with aggressive dignity so long as there remains a reasonable possibility that his views may prevail. See, e.g., Brown v. State, 206 So.2d 377 (Fla. 1968).
I, therefore, do not agree that the instant revenue certificate issue is valid because of any characteristics which allegedly distinguish it from Jacksonville Port Authority, supra. I simply feel that it should be upheld for the same reasons which I feel should have prevailed, but failed to prevail, in the decisions cited at the outset of this opinion.
I concur in the conclusion of affirmance.
DREW, Justice (dissenting):
This is an appeal by the State of Florida and Dan Paul, an intervening taxpayer, from a final decree of the Circuit Court of Dade County validating $34,640,000 of Dade County Port Authority Special Revenue Bonds, proposed to be issued for the purpose of providing funds for the construction and erection of certain facilities for the exclusive use of National Air Lines, Inc. on lands owned by the Port Authority and leased to National. The lease agreement for 30 years, dated October 16, 1967,[1] pursuant to which these bonds are proposed to be issued reveals that such facilities are to consist of a new aircraft maintenance apron, an in-flight kitchen, two employees' parking structures, a new aircraft hanger, an administration facility and a utilities center. The bonds are to be retired, according to the lease agreement, from rentals to be paid by National to the Port Authority over the period of the lease agreement or from rental payments received from others than National for the new facilities. In addition to the $34,640,000 issue of bonds validated by the questioned decree, the agreements between the parties contained the further provision that the Authority will issue such additional revenue bonds as may be required to complete the payment of the cost of constructing the facilities described in the lease agreement and other documents.
*205 The bond resolution authorizing the issuance of such bonds specifically provides that the bonds shall not be deemed to constitute a debt of the County of Dade and that the County is not obligated to pay the bonds or the interest thereon except from the special fund heretofore alluded to and that the faith and credit of the County are not pledged to the payment of such principal and interest.
The principal contention of appellants is that the issuance of such bonds violates Section 10, Article IX, of the Florida Constitution.[2] Appellants also contend that the Authority's attempted tax exemption and its agreement to pay any taxes assessed against the facilities violates Sections 1, 5 and 10 of Article IX and Section 16 of Article XIV of the Florida Constitution and constitutes the taking of the property of appellants and other taxpayers of Dade County without due process of law and denied to them equal protection of the law in violation of Section 12 of the Florida Declaration of Rights and the Fourteenth Amendment to the Constitution of the United States.
As to the first contention, viz: whether the issuance of the proposed bonds violates Section 10 of Article IX of the Florida Constitution, which prohibits a county from appropriating money for or lending its credit to any corporation, association, institution or individual, it is necessary to examine some of the provisions of the lease agreement between the Authority and National. The agreement between the parties which has been validated and confirmed in the questioned final decree contains, among others, the following provisions material to the disposition of the primary question:[3]
1. The Authority cannot make any rules and regulations which "restrict the use of the new facilities".
2. National has almost sole control over the bond proceeds and the construction of the facilities. National in its own discretion has the right to require the Authority to commence construction prior to the sale of the bonds by advancing the costs. The Authority agrees to repay National such advances. If the bonds are not sold the Authority could be left with a half-completed building and be required to repay National from its other funds such as ad valorem tax funds levied by the Authority under its taxing powers. The plans and specifications are prepared at National's direction; National determines whether and when construction will begin. All commitments and advances made by the Authority for engineering or architects' or consultants' fees and expenses for surveys and testing are subject to the prior written approval of National. National determines how the project is to be split for purpose of bidding. The Authority cannot enter into "any contract without the prior written approval of National". The terms and conditions of all contracts for the construction of the facilities shall be subject to the prior written approval of National. "If the bid of the lowest responsible bidder for any portion of the Project is excessive in the sole opinion of National", the Authority is required to reject all bids. National can also require the Authority to readvertise the bids if it so requests. The Authority *206 is required to force the contractor to pay National liquidated damages or a performance bond "to protect National from financial loss resulting from failure of the contractors to meet the agreed completion date". National controls the action the Authority can take to enforce timely completion. Moreover, the lease agreement provides "any liquidated damages received by the Authority pursuant to such construction contracts shall be for National's account".
3. If a default causes the bonds to become immediately due and payable, National is not required to accelerate its obligation to make payments and the Authority would have to pay the bonds from other funds.
4. If the proceeds from the sale of the $34,640,000 bond issue are insufficient to pay for the new facilities, National can require the Authority to authorize, validate, and sell and issue additional revenue bonds to complete the project.
5. National has the exclusive use of the new facilities for a broad variety of its own private purposes until the year 1997.
6. National has the right to elect how insurance proceeds are used. If National elects to use the proceeds to pay the bonds and there is any excess, the Authority has to pay National for each remaining year of the lease 4% of the excess insurance proceeds.
7. National inspects the facilities for itself to determine whether it is complying with its obligation to keep the buildings in repair and the Authority has no right to have an engineer or architect inspect for the Authority unless National fails to do so or 5% in principal amount of bond holders request an inspection. And then no such inspection by the Authority's architects and engineers may be made more often than once in any 36-month period.
8. If the bonds are refunded the Authority has to pay National for the loss of earnings which it is estimated would have been derived from the investment of moneys in the bond service and reserve account.
9. National has the right to force the Authority to authorize and endeavor to sell refunding bonds of the Authority.
10. If National damages the property the Authority has no recourse against National but must look solely to the insurance. If the Authority damages National's property, the Authority is liable to National in full.
11. National can terminate the Supplemental Agreement upon 30 days' written notice to the Authority if in National's opinion the Airport becomes inadequate for National's operations because the Authority has failed to provide adequate facilities for National. If National so terminates the agreement, the Authority has to pay National for each year then remaining in the term of the agreement 4% of the proceeds of the bonds including earnings and bond discounts together with 2 1/2% interest. "The repayments required to be made to National under the provisions of this Agreement shall be made from any funds of the Authority available for such purpose * * *".
12. National without the Authority's consent may sublet any part of the new facilities which it doesn't need to anyone for "aviation related purposes".
13. The Authority agrees to pay any taxes which may be levied against National.
14. The Authority is required at its own expense and not payable from the bond proceeds to install all utility services, including water, gas, electricity, sewage, and telephone.
The Authority conceded at the hearing in said cause that it obtains nothing for the public for the attempted exemption from all taxes, depreciation on the facilities and the amortization savings to National, and having funds raised by such facilities at the Authority's lower interest rate.
*207 The provisions of the lease agreement demonstrate the complete abdication of the county's power and authority over this project and its subsequent use. Such control is incompatible with any theory of "a public purpose".
In the past fifteen years this Court has rejected as violative of Section 10, Article IX, of the Florida Constitution many bond issues proposed by public bodies to finance various projects. In 1952 in State v. Town of North Miami, 59 So.2d 779, this Court rejected a proposal of the Town of North Miami to issue bonds to be used to purchase lands within the corporate limits to erect an aluminum manufacturing plant and to lease the same for a term of 20 years to a private corporation. In that same year in Adams v. Housing Authority of City of Daytona Beach, 60 So.2d 663, this Court held that Chapter 27072, Acts of 1945, authorizing a redevelopment project of the City of Daytona Beach, was violative of Section 10, Article IX, in that an attempt was there made to authorize the appropriation of public funds for private purposes and to loan the credit of the city to corporations, associations or individuals for purposes not public. In 1954 in City of Clearwater v. Caldwell, 75 So.2d 765, this Court held that an attempt by the City of Clearwater to lease for 50 years for profit or as an investment for the city to a private individual for private gain or profit to him a portion of land theretofore acquired by it for municipal purposes was violative of Section 10, Article IX. In 1959 in City of West Palm Beach v. State, 113 So.2d 374, this Court refused to validate an issue of public obligation bonds to be used for the construction of a civic center composed of auditoriums, restaurants, marinas, stores, swimming pools, grandstands, off street parking, central recreation building, artificial beaches and a fuel station and to lease the same to a private corporation for a period of years because such arrangement violated Section 10 of Article IX. In 1960 in State v. Suwannee County Development Authority, 122 So.2d 190, this Court refused to validate revenue anticipation certificates of Suwannee County Development Authority to provide funds for the purpose of purchasing land and constructing thereon buildings for lease to private industry which the authority hoped to bring into the county, as being violative of Section 10, Article IX. In 1962 in State v. Clay County Development Authority, 140 So.2d 576, this Court reversed a decree validating $500,000 of revenue anticipation certificates proposed to be issued by the Clay County Development Authority for the purpose of constructing a building and appurtenances to be leased to a private corporation over a period of years for the manufacture of plastic products, as violative of Section 10, Article IX. In 1965 in State v. Washington County Development Authority, 178 So.2d 573, this Court held violative of Section 10, Article IX, an attempt of the Authority there to borrow $244,000 from the United States of America for the purpose of aiding and financing a rural development project for sale to purchasers approved by the government as violative of Section 10, Article IX. In 1966 in Brandes v. City of Deerfield Beach, 186 So.2d 6, the City of Deerfield Beach attempted to issue bonds for the purpose of acquiring land and constructing facilities to be used as spring training headquarters for the Pittsburgh Pirates and to thereafter lease the same to the corporation owning said ball club. This Court rejected said bonds as being violative of Section 10, Article IX.
Today the ink is barely dry upon two decisions of this Court refusing to validate revenue bonds sought to be issued by duly constituted public authorities because they violated the mandate of Section 10 of Article IX of the Florida Constitution. These cases are State v. Manatee County Port Authority and State v. Jacksonville Port Authority.[4] The facts in these two cases are clearly delineated *208 in the respective opinions. In both cases this Court refused to validate the industrial bonds proposed to be issued by these public authorities because to do so would offend the constitutional mandate of Section 10, Article IX. In the Manatee County case Justice Thomas, speaking for the Court, said:
"We thought and hoped that we had laid down a specific exception to the rule that public funds may not be spent for private purposes. This rule was announced as early as 1933 in the case of Brumby v. City of Clearwater, 108 Fla. 633, 149 So. 203. In the intervening years, the exception has been recognized. We have repeatedly held that use of part of the proceeds of such bonds for incidental private operations will not vitiate the entire issue, but we have reiterated the restriction that diversion of any part of the funds will not be tolerated unless the expenditure is purely incidental to the main project. Such were the effects of the decisions in Adams v. Housing Authority of City of Daytona Beach, Fla., 60 So.2d 663; Gate City Garage, Inc. v. City of Jacksonville, Fla., 66 So.2d 653; Panama City v. State, Fla., 93 So.2d 608; State v. Clay County Development Authority, Fla., 140 So.2d 576, and in the later case of State v. Washington County Development Authority, Fla., 178 So.2d 573, and in the recent case of Brandes v. City of Deerfield Beach, Fla., 186 So.2d 6.
"In most, if not all, of these cases the plea has been made that the proposed project would be of great benefit to the area affected. In the present case the converse is presented with great emphasis on behalf of the City of Tampa which, it is argued, would become a `second rate' port if the contemplated project materialized. But neither the advantage to one community nor the disadvantage to another is the criterion by which this Court should judge the merits of a given project. The guiding star is the Constitution itself and the interpretation conscientiously given it by this Court."
In the Jacksonville Port Authority case the Court said:
"In the past fifteen years a majority of this Court has consistently adhered to the mandates of this section of the Constitution when confronted by proposals to issue public securities in which the private interests to be served by the overall project was more than incidental. The cases are legion in which this Court has flatly refused to approve the issuance of public securities for the purpose of assisting in the establishment of industrial developments, housing projects, building apartment houses, baseball stadiums and projects of such nature, no matter how worthy the objectives might have been in such cases where the benefit to the public was shown to be only incidental. The dissenting opinions which have been filed in many of these cases are the best evidence of the fact that this Court has limited the issuance of such public securities to those instances where the private purpose served [if any] was purely incidental such as that which existed in the Gate City case in Jacksonville, the Panama City case and many others.
"It is said in some of the dissenting opinions that this Court has not been consistent in its views upon the subject. The basic principle involved has been consistently adhered to. The factual issue, however, of whether the public purpose was the overriding and paramount purpose has evoked dissension in the Court from time to time. The cleavage, if any, lies in this area."
The proposal here to construct these facilities for National is a far more flagrant violation of Section 10 of Article IX than that which existed in either the Manatee County or the Jacksonville Port Authority *209 cases.[5] The approval of these revenue bonds today completely emasculates Section 10 of Article IX. The door is now wide open for the issuance of industrial bonds by any political subdivision of this State. These facilities have absolutely nothing to do with the essential operations of Miami International Airport. The failure to build said facilities and to lease said buildings to one air carrier, National, for its exclusive use, would not materially affect the operation of the Miami International Airport as a public utility. If it constituted a valid public purpose, by the same reasoning the Port Authority would have the power to condemn any lands in Dade County and to construct thereon similar buildings and facilities for every other airline operating through the International Airport, or to construct and erect any facility however remotely related to air transportation. If this is now to be the law of this State, it should be done by constitutional amendment and legislative action, not by tearing out of our present Constitution the provisions which have been in it since it was originally enacted in 1885 and which have served a most salutary purpose.[6]
The majority place great emphasis on the cases of State of Florida v. Dade County, 1946, 157 Fla. 859, 27 So.2d 283, and Seaboard Air Line R. Co. v. Peters, Fla. 1949, 43 So.2d 448. In neither of these cases was the question of a violation of Section 10 of Article IX involved.[7] The earlier case involved the question of whether the population act creating the Dade County Port Authority violated Section 21 of Article III of the Constitution in that it classified counties by population on a subject which had no reasonable relation to the subject regulated and that the purposes for which the act was created, viz. purchasing the former Pan American Airways Airport, was a valid county purpose. This Court held *210 that the act was not violative of such provision and that the operation of an airport was a valid public county purpose. It approved the issuance of revenue bonds of two and a half million dollars to be used for the purpose of acquiring this public facility. No question was involved relative to extending the credit of the State to any private individual or corporation.
The second case involved a proposed issue of revenue bonds to purchase additional land for the airport and to pay for removal and relocation of certain railroad facilities thereon. There this Court held that the acquisition and development of additional land essential to the safe operation of Miami International Airport was a county purpose for which such revenue bonds could be issued. The question of Section 10 of Article IX was in no way involved in these proceedings. Mr. Justice Hobson in that case in a special concurring opinion stated:
"* * * It is necessary in this case only to determine whether the maintenance and improvement of this airport is an essential government requirement of Dade County. The Courts will decide whether an airport in any other county of Florida is an essential governmental requirement when faced with that question[8].
The majority opinion to which this dissent is directed also contains the statement:
"We likewise distinguish this decree from our holding in [the Clay County case] * * *. In the latter case the Court was of the opinion that the overall purpose was private and not public because they were dealing with a private corporation with the thought of engaging in the plastic business, a private as distinguished from a public purpose. In no sense was that a public project."
In the Clay County case referred to,[9] this Court rejected a proposed issue of revenue bonds as violative of Section 10 of Article IX of the Constitution. The holding in that case was not as stated in the majority opinion that "the overall purpose was private and not public." The Court had previously decided in State ex rel. Ervin v. Cotney, 104 So.2d 346, that the statute creating the Clay County Development Authority was a valid statute but specifically pointed out in that opinion that the provisions in the act authorizing the public authority thereby created to sell or lease portions of the improvement to private parties would not invalidate the plan for acquisition and improvement of the property by the public body where a valid public purpose would be effectuated by such a plan. The following is a quotation from that opinion:
"* * * The setting aside for industrial and commercial purposes of a portion of the property already purchased is certainly a part of the balanced over-all plan for the County's development; but there is nothing in the record here to show that this was the primary purpose for the acquisition of the federal government's surplus tract of land rather than an incidental part thereof. In these circumstances *211 we can find nothing in the previous decisions of this court construing § 10 of Article IX requiring us to hold that the Authority's acquisition of the property and proposed program for its development amounts to an appropriation of the Authority's funds for, or the lending of its credit to, a private enterprise."
The quoted language above was merely a reiteration of the long-standing holding of this Court in cases of this kind that a public purpose would not be defeated by the fact that private parties benefited therefrom so long as the private purpose was purely incidental to the paramount public purpose. Such, in my humble judgment, is not the case here.
The Authority says that this Court has already approved a substantial number of bond validations based on leases calling for the construction of comparable or identical facilities built in the Miami International Airport and has thus "in unequivocal language aligned this Court with the legislative determination of the public nature of the facility." As to the quoted language, there is not now nor has there been since the decision of this Court in State v. Dade County, 157 Fla. 859, 27 So.2d 283, any question that the operation of the Miami International Airport and the facilities necessary thereto constitute a public purpose. There can no longer be any question on this point. Air travel has largely replaced other modes of passenger transportation and has made great inroads upon the delivery of things. Hangars for the use of repairing and storing planes such as that involved in State v. Okaloosa County Airport and Industrial Authority, 168 So.2d 745, are necessary adjuncts to the operation of an airport. In this connection, however, it should be noted that in the Okaloosa County case the Court said "Clearly, there is an interdependence between the Authority's airport and the facilities proposed for the repair, maintenance and care of the aircraft of the flying public using said airport. For example, runways on a public airport are not the only facilities essential to the functional operation of an adequate airport. A number of other facilities and aids are essential, including those contemplated in the project here." There is a vast distinction between the operation of such a facility for the benefit of the "flying public" and operation for the exclusive benefit of one corporation, viz. National Airlines.
As to the argument as to former bond validation decisions approving these or similar lease agreements, reliance is apparently upon two cases of this Court, viz. State v. Dade County, 62 So.2d 404, and State v. Dade County, 84 So.2d 41.[10] Both of these cases involved proposed bond issues quite similar to that involved in this case. In both cases this Court approved the issuance of bonds similar to those involved in this case for the purpose of erecting certain facilities for National Airlines. The first case involved bonds to be financed from revenues from the facility over a period of ten years, and the second involved bonds to be issued for the purpose of furnishing additional facilities for National Airlines, such bonds to be retired from revenues from the facility over a period of twenty-five years. The two questions raised, argued or determined by this Court in these cases were whether these bonds required the prior approval of the voters of Dade County in accordance with the provisions of Article IX, Section 6, of the Florida Constitution, and the power of the authority to enter into the lease agreement referred to in the opinions. The question of whether the arrangements between the Port Authority and National Airlines set forth in these two opinions violated the provisions of Section 10, Article IX of the Florida Constitution was not raised, argued or determined, and such cases cannot be said to be authority for the proposition that this Court has held such bonds not to be in contravention of said constitutional provisions.[11]
*212 I unreservedly say that this Court for the first time today has held an issue of industrial bonds by a public authority of this State not to be violative of Section 10, Article IX of the Constitution. As we pointed out in the Jacksonville Port Authority and Manatee County cases where the question has been raised, this Court as a condition to its approval of such obligations made a specific finding that any private purpose served was purely incidental to the public purpose.
In an era when supremacy of law already suffers daily attack, I stand in real fear of the consequence of a decision which can only "bring adjudications of this tribunal into the same class as a restricted railroad ticket, good for this day and train only."[12] There is in the present case not the slightest suggestion of any change in law or circumstance on the basis of which courts have justified a departure from precedent or altered constitutional construction.[13] When this Court approves today that which it held yesterday to be proscribed by the same constitutional provisions applied to other parties, there can be no clearer rejection of the concept of equality before the law.[14] The administration of justice in this fashion violates, in my opinion, elemental principles of judicial action and, quite likely, constitutionally guaranteed rights.
The great economic considerations here involved, together with their peculiar susceptibility to change by the will of the people expressed in constitutional amendment, impel a judicial restraint far beyond the ordinary considerations of stare decisis. In recognition of a necessity for such judicial self-restraint, and the fact that in some matters "it is more important that the applicable rule of law be settled than that it be settled right,"[15] I have on numerous occasions refused to repudiate recent decisions rendered by a majority of the members of the Court against my express dissent.[16] Even critics of the doctrine of precedents concede the necessity for such restraint:
"* * * It happens again and again, where the question is a close one, that a case which one week is decided one way might be decided another way the next if it were then heard for the first time. The situation would, however, be intolerable if the weekly changes in the composition of the court were accompanied by changes in its rulings * * *." Lecture IV, Cardozo, The Nature of the Judicial Process.
The question raised by the taxpayer Paul referred to in the introduction to this opinion concerning the Authority's attempted tax exemption of the facilities is, in my opinion, well founded. The supplemental agreement provides:
"It is expressly understood and agreed that the Authority shall, if not prohibited by law, assume and pay all taxes and improvement charges of any nature whatsoever which may be levied or assessed against the New Facilities, or the leasehold interest of National therein."
The above provision not only exceeds the powers granted the Dade County Port Authority but I think exceeds any power which could be lawfully granted to it. Section 16 of Article XVI of the Constitution requires the taxation of all property of corporations *213 except such as shall be used for certain designated purposes.[17] Section 1 of Article X contains a provision that the Legislature shall provide for uniform and equal taxation. In my judgment the fact that the title to the property in question remains in the Authority is of no importance in view of the fact that the property will for these long years be used exclusively by a private corporation.[18] I would agree completely with the holding of the Supreme Court of Georgia in the case of Smith v. State, 222 Ga. 552, 150 S.E.2d 868, in which case, in passing upon an identical question, the Supreme Court of Georgia said:
"`The discrimination in taxation which the equal protection clauses forbid is the failure of the taxing authorities to tax all like property which is subject to taxation equally or tax the property of one owner and exempt like property belonging to another owner' * * * the exemption of private industry from taxes while requiring plaintiff and other private industries in the county to pay said taxes would constitute taking of the property of plaintiffs and other taxpayers of Telfair County who are engaged in private business, without due process of law and would deny them equal protection of the law in violation of the federal Constitution. Thus, the constitutional amendment * * * is in violation of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States."
Also see Village of Moyie Springs v. Aurora Manufacturing Company, 82 Idaho 337, 353 P.2d 767 (1960).
There is another cogent reason why this Court should not take this giant stride. There will inevitably be three new members of this Court in January of 1969, about eight months hence. If these Justices in subsequent cases involving this section of the Constitution should have the views expressed in this dissent, then we may well, once again, be back where we started. What, then, becomes of our concept that "this is a government of laws and not of men"?
I dissent.
NOTES
[1] This lease agreement is the seventh amendment to the original lease of October 1, 1952 pursuant to which the Authority issued $750,000 of revenue bonds to construct for National a "warehouse and overhaul shop". These bonds were the subject of our decision in State v. Dade County, 1952, 62 So.2d 404. Thereafter, in June and September 1955, pursuant to amendments #1 and 2 to the original lease, additional bonds were issued and validated. These bonds were the subject of our decision in State v. Dade County, 1955, 84 So.2d 41. This latter opinion affirmed the final decree of validation on the authority of the decision in 62 So.2d 404.
[2] "Section 10. Credit of state not to be pledged or loaned.  The credit of the State shall not be pledged or loaned to any individual, company, corporation or association; nor shall the State become a joint owner or stockholder in any company, association or corporation. The Legislature shall not authorize any county, city, borough, township or incorporated district to become a stock holder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual."
[3] Compare these provisions with those discussed in State v. Manatee Port Authority, 1966, Fla., 193 So.2d 162, and State v. Jacksonville Port Authority, 1967, Fla., 204 So.2d 881. Both authorities in these cases were engaged in the operation of facilities for water transportation while in this case the Authority is engaged in air transportation, both admittedly public purposes.
[4] See note 3, supra.
[5] The abuse of the power to issue such tax exempt securities for the primary benefit of private individuals or corporations has resulted in a recent proposed regulation by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury, the effect of which is to eliminate the tax exempt status of such securities issued subsequent to March 15, 1968 except such bonds initially sold at any time prior to September 15, 1968 under the conditions named in the regulation.

In paragraph 1.103-7 of such proposed regulation, it is provided:
"Example (1) (a) Governmental Unit A and corporation X enter into an agreement under which the governmental unit is to provide a factory which corporation X will lease for 20 years. The agreement provides (1) that the governmental unit will issue $10 million of bonds, (2) that the proceeds of the bond issue will be used to purchase land and to construct and equip a factory in accordance with corporation X's specifications, (3) that corporation X will rent the facility for 20 years at an annual rental equal to the amount necessary to amortize the principal and pay the interest on the outstanding bonds, and (4) that such payments by corporation X and the facility itself shall be the security for the bonds."
That the bonds involved in these proceedings fall squarely within this example cannot be successfully controverted. See Federal Register, Volume 33, #58, Saturday, March 23, 1968, p. 4951, et seq.
[6] After months of study, the Florida Constitutional Revision Commission, created under the authority of Chapter 65-561, General Laws, Acts of 1965, proposed a new article to the Florida Constitution to replace Section 10 of Article IX to read as follows:

"Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of, or give, lend, or use its taxing power or credit directly or indirectly to aid any corporation, association, partnership, or person; * * *"
Instead of receding from the position which this Court has taken from the beginning, such proposal is much stronger in its condemnation of any arrangement to extend the State's credit to individuals.
[7] The validation statutes of this State do not protect bond holders on matters not adjudicated in the decree. Sec. 75.09, Fla. Stat. 1967, F.S.A. The statutory language is "* * * such judgment is forever conclusive as to all matters adjudicated * * *."
[8] In the later case of State v. Town of North Miami, 59 So.2d 779, this Court speaking through Mr. Justice Mathews for a unanimous Court said with reference to this case:

"State v. Dade County, 157 Fla. 859, 27 So.2d 283, was a recognition by this Court that air transportation was one of the great innovations of the age, that Miami was potentially one of the greatest air transportation points in the world, and that Florida is a port of entry for air transportation from South and Central America, the West Indies and Africa. The airport in question was to be publicly owned and publicly operated and it is recognized that air transportation, such as that flowing into and out of Miami, serves a real public purpose, and in developing this port owning and operating the same, it could not be said that the City of Miami [Dade County] was not serving a public and municipal [county] purpose."
[9] State v. Clay County Development Authority, 140 So.2d 576.
[10] See footnote 3, supra.
[11] See footnote 7, supra.
[12] Smith v. Allwright, 321 U.S. 649, 669, 64 S.Ct. 757, 768, 88 L.Ed. 987.
[13] Georgia S. & F. Ry. Co. v. Seven-Up Bottling Co., Fla. 1965, 175 So.2d 39.
[14] Cf. Frank, Courts on Trial, Ch. XIX, p. 267, et seq.
[15] Burnet v. Coronado Oil & Gas Co. (1932), 285 U.S. 393, 406, 52 S.Ct. 443, 447, 76 L.Ed. 815.
[16] Seaboard Air Line Railroad Company v. Williams, Fla. 1967, 199 So.2d 469, 471; Johnson v. State, Fla. 1961, 130 So.2d 599, 601.

"* * * now that the Court has decided otherwise judicial self-discipline requires me to follow the political dogma now constitutionally embedded in consequence of that decision. * * *" Averv v. Midland County, Tex., 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45, opinion filed April 1, 1968.
[17] Compare Jasper v. Mease Manor, Inc., Fla., 208 So.2d 821, opinion filed March 27, 1968.
[18] See F.S. Sec. 192.62, F.S.A., which in terms authorizes taxation of leasehold interests in immune property which is used for private profit. Also see Hillsborough County Aviation Authority, etc. v. Walden as Tax Assessor of Hillsborough County, Florida, Fla., 210 So.2d 193, opinion filed April 24, 1968.